UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRION ROCKWELL,

              Plaintiff,

      v.

CHASE BANK,

              Defendant.

Case No. C10-1602RSL

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION TO DISMISS

## I. INTRODUCTION

This matter comes before the Court on defendant Chase Bank's motion to dismiss plaintiff Brion Rockwell's First Amended Complaint ("FAC").[1] Mot. (Dkt. # 20). Plaintiff's amended complaint[2] alleges at least twelve causes of action related to a credit card account originally issued by Washington Mutual Bank ("WaMu"). Plaintiff purports to bring all claims

---

[1] Defendant's request for oral argument is denied.

[2] Plaintiff filed his original complaint on October 6, 2010. See Compl. (Dkt. # 1). Plaintiff's First Amended Complaint, filed on December 23, 2010, is the operative complaint. See First Am. Compl. (Dkt. # 17).

on behalf of himself and all others similarly situated.[3]  FAC ¶ 31.  Throughout this Order, the Court will refer to plaintiff and the purported class simply as "plaintiff."

## II.  BACKGROUND

### A.  Documents Considered by the Court

The only evidence supplied by plaintiff is a copy of the change-in-terms notice mailed by defendant in July 2009 and a copy of plaintiff's credit card statement covering the dates of September 23 to October 22, 2009.  See Compl. (Dkt. # 1), Ex. A; Rockwell Decl. (Dkt. # 23-1) at 2-3.  Defendant seeks to fill the evidentiary void by attaching a number of documents to the declaration accompanying its motion to dismiss.  This set of documents includes: (1) a sample preapproval solicitation, similar to the one mailed by WaMu to plaintiff in August 2008 (Dkt. # 14-1); (2) a sample WaMu Account Agreement, similar to the one that governed plaintiff's WaMu Credit Card (Dkt. # 14-3); and (3) a sample Chase conversion letter and Cardmember Agreement, similar to the one that defendant sent to plaintiff following its acquisition of plaintiff's account (Dkt. # 14-4).

The preapproval solicitation, WaMu Account Agreement, and Chase conversion letter and Cardmember Agreement are merely "sample" copies that were not actually mailed to plaintiff.  However, plaintiff's amended complaint implicitly refers to these documents, and his claims depend on their content.  See FAC (Dkt. # 17) ¶ 16 (referring to the preapproval WaMu Account Agreement), ¶ 17 (Chase conversion letter and Cardmember Agreement), ¶ 79 (preapproval solicitation).  Moreover, plaintiff does not dispute their authenticity or relevance.[4]

---

[3] Plaintiff defines the purported class as "[a]ll persons or entities that entered into loan agreements with Chase, whereby Chase promised an applicable interest rate until the loan balance was paid in full, but who have been notified by Chase that the terms on their existing balances have been changed."  FAC ¶ 31.

[4] In fact, plaintiff's Response twice cites to the sample preapproval solicitation attached to the Haug Declaration.  See Resp. (Dkt. # 23) at 7.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 2

The Court takes notice of all three documents. See Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994), overruled on other grounds by Galbraith v. County of Santa Clara, 307 F.3d 111 (9th Cir. 2002) (the Court may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [complaint].").

Plaintiff and defendant also refer to the September 25, 2008, Purchase and Assumption Agreement ("P & A"), the document under which defendant acquired plaintiff's WaMu credit card account from the FDIC receivership. The P & A is publicly available on the FDIC's website.[5] However, plaintiff appears to question the authenticity of this document. See Resp. (Dkt. # 23) at 5 n.1 ("Chase cites to an unsigned, unauthenticated document stored at http://www.fdic.gov/about/freedom/Washington_Mutual_P_and_A.pdf. Mr. Rockwell objects to the admissibility of unsigned [sic] [.]"). Under Fed. R. Evid. 201, the Court may take judicial notice of facts that are "not subject to reasonable dispute" because they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Here, plaintiff's conclusory objection to the P & A is not reasonable because plaintiff has not identified a single inaccuracy. In fact, even as plaintiff disputes the P & A's accuracy, he quotes from the document in his response. See Resp. (Dkt. # 23) at 5. Plaintiff has not revealed a specific source for his quote or explained why his source is more accurate than the one on the FDIC's website. For the purposes of this motion, and only to the extent that the document is admissible at trial, the Court takes notice of the September 2008 P & A.

**B. Facts**

In August 2008, WaMu sent plaintiff a pre-approved solicitation for a credit card. FAC ¶ 16. Plaintiff responded to the solicitation and obtained a Visa credit card with an initial annual percentage rate of 9.99% for purchases. See Haug Decl. (Dkt. # 14-2). However, on September

---

[5] See Purchase and Assumption Agreement (Sept. 28, 2008), available at http://www.fdic.gov/about/freedom/Washington_Mutual_P_and_A.pdf.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 3

25, 2008, federal banking regulators placed WaMu into receivership with the FDIC. FAC ¶ 17; Haug Decl. (Dkt. # 13) ¶ 6. Under a Purchase and Assumption Agreement executed that same day, defendant Chase acquired a number of WaMu's assets, including a number of WaMu's credit card accounts. FAC ¶ 17.

Plaintiff's credit card account was among the assets acquired by defendant. FAC ¶¶ 16-17. Rockwell Decl. (Dkt. # 23), ¶ 3. In January 2009, defendant mailed plaintiff an account conversion letter and a new Chase Cardmember Agreement ("January 2009 Cardmember Agreement" or "defendant's initial disclosures"). See Haug Decl. (Dkt. # 14-4). The account conversion letter advised plaintiff that the attached Cardmember Agreement would completely replace his existing agreement with WaMu. Id. at 3. In July 2009, defendant mailed plaintiff a document entitled "Important Change In Terms Notice Enclosed – Please Read." FAC ¶ 18; Complaint (Dkt. # 1), Ex. A ("July 2009 change-in-terms notice"). According to the notice, defendant planned to amend the January 2009 Cardmember Agreement in two principal ways: First, the standard APR for purchases and balance transfers would change to a variable rate—the Prime Rate plus 12.99%. Second, the standard APR for cash advances would change to a variable rate—the Prime Rate plus 15.99%. FAC ¶ 22, 24; Complaint (Dkt. # 1), Ex. A. Defendant attributed the changes to "market conditions, new federal laws and regulations, and [defendant's] increasing costs." Id. The new terms were to be "effective the first day of [plaintiff's] billing cycle that includes October 1, 2009." Id. All changes were to "apply to **current and future balances** on [plaintiff's] account." Id. (emphasis in original). Plaintiff could opt out of the amendments only by notifying defendant in writing, ceasing to use the credit card for new transactions, and paying off the outstanding balance under the original terms and conditions. Id.

Defendant presents undisputed evidence that plaintiff continued to use his credit card after receiving the change-in-terms notice. Haug. Decl. (Dkt. # 13), ¶ 8; see also FAC ¶¶ 27-28.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 4

Because plaintiff failed to "opt out," defendant applied the July 2009 changes to the billing cycle that ran from September 23, 2009, to October 22, 2009. Rockwell Decl. (Dkt. # 23-1) at 2. Plaintiff's billing statement for that cycle reflected an effective APR of 16.24% for purchases. Id. Plaintiff's statement also showed a $56.60 finance charge owing on plaintiff's outstanding balance. Id.

The gravamen of plaintiff's FAC is that defendant's retroactive APR increase was unlawful for at least two reasons. First, plaintiff alleges that defendant failed to disclose the retroactivity of the increase adequately. See FAC ¶¶ 1-2. Second, plaintiff alleges that even if the disclosure were adequate, defendant's retroactive rate increases were fraudulent, unconscionable, or otherwise illegal for a number of alternative reasons. Id. Ultimately, plaintiff claims that he was "forced to pay Chase more than [he'd] bargained for." Id. ¶ 26. Defendant moved to dismiss the FAC in its entirety. Mot. (Dkt. # 20) at 23. For the following reasons, defendant's motion is granted in part and denied in part.

### III. LEGAL STANDARD

**A. Rule 12(b)(6)**

Under Fed. R. Civ. P. 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Plaintiff asserts that the standard of review on a motion to dismiss is governed by Conley v. Gibson, 355 U.S. 41 (1957). See Resp. (Dkt. # 23) at 4. However, "pleading requirements for the federal courts have departed from the traditional Rule 8 standard under Conley v. Gibson . . . ." Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 n.6 (9th Cir. 2011). Dismissal is now appropriate when a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Aschcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "The plausibility

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. As a result, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Dismissal "can be based on the lack of a cognizable legal theory or absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990).

**B. Rule 12(b)(1)**

Under Fed. R. Civ. P. 12(b)(1), the Court must dismiss any claim over which it lacks subject matter jurisdiction. Chapman v. Pier 1 Imports (U.S.) Inc., 631 F.3d 939, 954 (9th Cir. 2011). Even if defendant does not explicitly move for dismissal under Rule 12(b)(1), the Court has a duty to establish subject matter jurisdiction *sua sponte*. See United Investors Life Ins. Co. v. Waddell & Reed Inc., 360 F.3d 960, 967 (9th Cir. 2004). When establishing subject matter jurisdiction, "the district court is not confined by the facts contained in the four corners of the complaint—it may consider [other] facts and need *not* assume the truthfulness of the complaint." Americopters, LLC v. F.A.A., 441 F.3d 726, 732 n.4 (9th Cir. 2006) (emphasis in origianal).

## IV. PLAINTIFF'S WAMU-BASED CLAIMS

As an initial matter, defendant argues that this Court lacks subject matter jurisdiction over all claims related to WaMu's pre-receivership acts or omissions. See Mot. (Dkt. # 20) at 6-8. Defendant's argument is well-taken. The Court lacks subject matter jurisdiction because plaintiff failed to exhaust the administrative claims process outlined in the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(d)(13)(D) ("Limitation on judicial review").[6] See Henderson v. Bank of New England, 986 F.2d 319, 320 (9th Cir.

---

[6] Congress enacted FIRREA to promote the prompt disposition of claims against failed financial institutions. See Yeomalakis v. Fed. Deposit Ins. Corp., 562 F.3d 56 (1st Cir. 2009) (citing H.R. Rep. No. 101-54(I), 101 Cong., 1st Sess., at 418-19, reprinted in 1989 U.S.C.C.A.N. 86, 214-15). As relevant here, FIRREA provides:

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 6

1993) ("Section 1821(d)(13)(D) strips all courts of jurisdiction over claims made outside

. . . [FIRREA's] administrative procedures."); see also Rundgren v. Wash. Mut. Bank, F.A., No.

C09-495JMS/KSC, 2010 WL 4960513, at *5 (D. Hawai'i Nov. 30, 2010) ("[T]o the extent that

Plaintiffs allege claims against Chase for WaMu's conduct, liability for those claims remain with

the FDIC and are therefore subject to FIRREA's administrative claims process.").  Accordingly,

plaintiff's WaMu-based claims fail under Fed. R. Civ. P. 12(b)(1).  See Wood v. CML-OR 5TH,

LLC, No. 10–1256–KI, 2011 WL 1131520, at *2 (D. Or. Mar. 28, 2011) (interpreting a FIRREA

exhaustion of remedies argument as a Rule 12(b)(1) motion to dismiss).

FIRREA's exhaustion of remedies requirement applies unless plaintiff can demonstrate

that the FDIC expressly transferred liability for pre-receivership borrower claims to the

subsequent purchaser (i.e. Chase Bank).  Caires v. JP Morgan Chase Bank, 745 F. Supp. 2d 40,

49 (D. Conn. 2010).  Here, no such transfer took place.  Under Article 2.5 of the September 2008

P & A, defendant expressly did not assume any liability for claims "related in any way to any

loan or commitment to lend made by [WaMu] prior to failure."  See Lemperle v. Wash. Mut.

Bank, No. C10-1550-MMA(POR), 2010 WL 3958729, at *4  (S.D. Cal. Oct. 7, 2010) ("Federal

courts in this circuit are in agreement, that any borrower claims pre-dating the P & A Agreement

cannot be brought against Chase.") (interpreting the same P & A at issue in the present case); see

also Yeomalakis, 562 F.3d at 60 ("When Washington Mutual failed, Chase Bank acquired many

assets but its agreement with the FDIC retains for the FDIC 'any liability associated with

borrower claims . . . .'  Thus, the FDIC was and remains the appropriate party in interest.")

---

Except as otherwise provided in this subsection, no court shall have jurisdiction over—(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D).

(quoting the same P & A at issue in the present case).  Therefore, to the extent plaintiff's claims are based on WaMu's pre-receivership acts or omissions, they are dismissed with prejudice for lack of subject matter jurisdiction.

## V.  RELEVANT TIME FRAME FOR REMAINING CLAIMS

The dismissal of plaintiff's WaMu-based claims narrows the field of issues presented by plaintiff's complaint.  As a result of the dismissal, all remaining claims relate solely to defendant's alleged acts or omissions occurring after defendant's September 25, 2008, acquisition of plaintiff's account.  The first post-acquisition act or omission allegedly occurred in January 2009, when defendant mailed plaintiff its conversion letter and Cardmember Agreement.  Haug Decl. (Dkt. # 14-4).  Therefore, January 2009 marks the starting point for this dispute.

## VI.  PLAINTIFF'S FEDERAL CLAIMS

### A.  Violations of the Truth In Lending Act (TILA), 15 U.S.C. §§ 1601 *et seq.*

Congress enacted TILA to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."  15 U.S.C. § 1601(a).  To effectuate TILA's purpose, the Court "must construe the Act's provisions liberally in favor of the consumer and require absolute compliance by creditors."  Hauk v. JP Morgan Chase Bank USA, 552 F.3d 1114, 1118 (9th Cir. 2009) (internal quotation omitted).

Here, plaintiff alleges various violations of TILA.  See ¶ FAC 79-81.  Before turning to the merits of these claims, the Court must determine whether plaintiff's claims are barred by the statute of limitations.

#### 1.  Plaintiff's TILA Claims are Timely

A one-year statute of limitations applies to claims for money damages brought under TILA.  See 15 U.S.C. § 1640(e).  In general, the TILA limitations period "starts at the

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 8

consummation of the transaction." <u>King v. State of California</u>, 784 F.2d 910, 915 (9th Cir. 1986). Regulation Z[7] defines "consummation" as "the time that a consumer becomes contractually obligated on a credit transaction." <u>Grimes v. New Century Mortgage Corp.</u>, 340 F.3d 1007, 1009 (9th Cir. 2003) (quoting 12 C.F.R. § 226.2(a)(13)). However, it is not at all clear what constitutes "consummation" where, as here, every use of a credit card constitutes a new and separate contractual obligation.

Relevant to this question is the fact that TILA and Regulation Z envision different disclosure requirements depending on whether a loan is an "open-end credit plan" or a "closed-end credit plan." <u>Compare</u> 15 U.S.C. § 1637 (mandatory disclosures in connection with an open-end credit plan) <u>with id.</u> § 1638 (mandatory disclosures in connection with a closed-end credit plan). TILA defines an "open-end credit plan" as "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602(i).[8] Consumer credit cards fall within the definition of open-end credit. <u>Barrer v. Chase Bank USA, N.A.</u>, 566 F.3d 883, 887 (9th Cir. 2009) ("[Plaintiff's] credit card is considered to be an 'open end credit plan' ").

The Ninth Circuit has not directly addressed the applicable limitations period for causes

---

[7] TILA is implemented by the Federal Reserve Board via Regulation Z. <u>See</u> <u>Hauk</u>, 552 F.3d at 1118. Regulation Z "gives teeth to TILA by prescribing specific disclosure requirements with which lenders must comply." <u>DeMando v. Morris</u>, 206 F.3d 1300, 1303 (9th Cir. 2000). The Court "must defer to the decisions of the Federal Reserve Board" and must not "apply '[t]he concept of 'meaningful disclosure' that animates TILA . . . in the abstract.' " <u>Id.</u> (quoting <u>Ford Motor Credit Co. v. Milhollin</u>, 444 U.S. 555, 568 (1980)).

[8] Similarly, Regulation Z defines "open-end credit" as "consumer credit extended by a creditor under a plan in which: (i) The creditor reasonably contemplates repeated transactions; (ii) The creditor may impose a finance charge from time to time on an outstanding unpaid balance; and (iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid." 12 C.F.R. § 226.2(20).

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 9

of action related to open-end credit plans. However, the Seventh Circuit has held that the limitations period for an open-end credit plan does not begin to run until the lender imposes a finance charge. See Goldman v. First Nat. Bank, 532 F.2d 10, 21 (7th Cir. 1973). In Goldman, the defendant imposed a finance charge for the first time almost a year after plaintiff opened his credit card account. Id. at 13. Only when he received his billing statement did plaintiff discover a discrepancy related to the calculation of his finance charge.[9] Id. Plaintiff subsequently filed a class action under TILA, arguing that defendant's disclosures did not accurately describe the date on which finance charges would commence. Id. at 15. Defendant moved for summary judgement, arguing that more than a year had passed since plaintiff first used his card. Id. at 17. Plaintiff responded with the contention—novel at the time—that the statute of limitations did not begin to run until he received his billing statement showing the inconsistent finance charge. Id. The Court agreed and held that "[t]he imposition of a finance charge under an open end credit plan . . . is a necessary condition for the assessment of liability [under TILA]." Id. at 21.

Numerous courts have since acknowledged Goldman's holding. See Jones v. TransOhio Sav. Ass'n, 747 F.2d 1037, 1042 (6th Cir. 1984); Bartholomew v. Northampton Nat. Bank of Easton, Easton, Pa., 584 F.2d 1288, 1296 (3d. Cir. 1978); see also McAnaney v. Astoria Fin. Corp., No. 04-CV-1101, 2008 WL 222524 (E.D.N.Y Jan. 25, 2008) (cataloguing additional cases acknowledging or following the Goldman rule).[10] Finding the reasoning in these cases

_____

[9] Plaintiff had 25 days from the receipt of his billing statement to pay off his balance. 532 F.2d at 13. After plaintiff's check arrived 3 days late, defendant imposed a finance charge in the following month's billing statement. Defendant calculated this finance charge essentially by applying a penalty for each day in the month spanning the two billing statements. Plaintiff pointed to a provision in the credit card agreement stating that "finance charges shall commence 25 days from billing date." According to plaintiff, this provision suggested that defendant would apply a penalty only for each day that his payment was late. Id.

[10] In King v. State of California, the Ninth Circuit rejected a "continuing violation" theory under which the limitations period would begin "when the disclosures are actually made." 784 F.2d at 914. However, the loan at issue was a closed-end credit transaction, and the Court did not address whether

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 10

persuasive, this Court will follow <u>Goldman</u> as well.

Applying the <u>Goldman</u> rule, the Court concludes that plaintiff's TILA claims are not time-barred.  Here, plaintiff correctly argues that the limitations period began to run on October 22, 2009, when plaintiff received his first billing statement reflecting the increased rate.  <u>See</u> Resp. (Dkt. # 23) at 5.  That billing statement revealed a "Finance Charge Due To Periodic Rate" of $56.00 owing on plaintiff's existing balance.  Rockwell Decl. (Dkt. # 23-1) at 2.[11]  As in <u>Goldman</u>, plaintiff's first opportunity to discover any allegedly inconsistent finance charges would have occurred on October 22, 2009, when he received his first billing statement following the July 2009 change-in-terms notice.  Accordingly, the statute of limitations began to run on that date.  Plaintiff filed his original complaint on October 10, 2010, within the one-year limit imposed by 15 U.S.C. § 1640(e).

## 2.  Plaintiff's TILA Claims Survive Only to the Extent That They Challenge the Clarity or Conspicuousness of Defendant's Disclosures under 15 U.S.C. § 1632(a)

Plaintiff alleges that defendant violated TILA by failing to "disclose [that] the modification to interest rates applied to existing balances."  FAC ¶ 80.  Plaintiff's FAC does not direct the Court to any particular provision of TILA that requires such disclosure.  However, plaintiff's Response clarifies that his TILA claim "is based on Chase Bank's failure to clearly disclose that the Bank may retroactively increase the interest on existing balances due [to] . . . Chase Bank's desire to increase profits."  Resp. (Dkt. # 23) at 6.  In other words, he finds fault both with (1) defendant's profit justification and (2) with defendant's retroactive rate

the limitations period would have been different in the context of open-end credit.  <u>Id.</u> at 913.

[11] Regulation Z defines the term "finance charge" as "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit."  12 C.F.R. § 226.4(a) (2009).  Although Regulation Z excludes certain charges and fees from its definition of finance charge, neither party disputes that the $56.00 charge included in plaintiff's October 22, 2009, billing statement constituted a finance charge within the meaning of Regulation Z.

increase.  The Court will address each of these arguments in turn.

### (a) *Plaintiff's Profit Justification Allegation*

Plaintiff alleges that defendant violated TILA by relying on a previously undisclosed profit justification when it increased plaintiff's APR.  FAC ¶¶ 2, 21, 80-81; Resp. (Dkt. # 23) at 7-8.  More specifically, plaintiff argues that WaMu's August 2008 preapproval solicitation failed to disclose clearly and conspicuously that defendant might increase plaintiff's rates to "maintain profitability."  See Resp. (Dkt. # 23) at 7.  Plaintiff concludes that defendant, having acquired plaintiff's account, must now answer for WaMu's inadequate disclosures.  The Court disagrees.  As noted above, plaintiff's WaMu-based claims are barred by FIRREA.[12]  To the extent that plaintiff alleges a cause of action against defendant for WaMu's pre-receivership conduct, liability for that claim remains with the FDIC.  See Rundgren, 2010 WL 4960513, at *5.

Plaintiff alleges that defendant is also liable for its post-receivership failure to disclose its profit justification clearly and conspicuously.  See FAC ¶¶ 8, 79 (appearing to allege both pre- and post-receivership liability).  Plaintiff's allegation implicates two separate TILA provisions: 15 U.S.C. § 1637(a), as implemented by Regulation Z at 12 C.F.R. § 226.6 (2009), and 15 U.S.C. § 1632(a), as implemented by Regulation Z at 12 C.F.R. § 226.5 (2009).  According to the Ninth Circuit, the former provision regulates the substance of defendant's required disclosures while the latter regulates their form.  See Barrer, 566 F.3d at 888 ("Just as section 226.6 states *what* must be disclosed, so section 226.5 describes *how* to disclose it.") (emphasis added).

Defendant argues, and the Court agrees, that the substance of its disclosures was adequate under 15 U.S.C. § 1637(a) and 12 C.F.R. § 226.6 (2009).  See Mot. (Dkt. # 20) at 10-11.  Section 226.6 requires creditors to provide an initial disclosure statement explaining "the circumstances under which a finance charge will be imposed and an explanation of how it will

---

[12] See supra Part IV.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 12

be determined . . . ." 12 C.F.R. § 226.6(a) (2009).  Although one could read this provision to require disclosure of any circumstance that might lead to a finance charge (including a profit-based motive), courts have interpreted the provision far more narrowly.  Specifically, because § 226.6 enumerates a list of specific disclosure requirements, "only the items enumerated in the list must be disclosed."  Barrer, 566 F.3d at 891 n.8 (9th Cir. 2009).  The Ninth Circuit has found that  "[d]isclosure of the basis for increases in a periodic rate (such as an APR) is not on that list."  Id.

However, § 226.6 is not the only applicable authority.  According to Comment 11 of Regulation Z's official staff commentary, "even if the creditor could not know what a potential increased rate would be when it made the original disclosures, 'the creditor must provide an explanation of the specific event or events that may result in the increased rate.' "  Barrer, 566 F.3d at 889 (quoting 12 C.F.R. Pt. 226 Supp. I, par. 6(a)(2) cmt. 11.).  Examples of "specific events" include "late payments and credit draws in excess of the credit limit."  Plaintiff argues that Comment 11 requires prior disclosure of a profit justification.  See Resp. (Dkt. # 23) at 8 ("Maintaining profitability was not initially disclosed as a reason for increasing the interest rate as required by [Comment 11].") (internal quotation marks omitted).

Plaintiff reads Comment 11 too broadly.  As Ninth Circuit precedent makes clear, "neither [TILA] nor Regulation Z demands clairvoyance from creditors."  Barrer, 566 F.3d at 889.  Although Courts must construe TILA in favor of the consumer, the Act "does not protect against every sharp credit practice."  Id. at 891 n.9.  In fact, a general change-in-terms provision—that is, a provision that simply reserves the creditor's right to modify the credit card agreement—will satisfy Comment 11's disclosure requirement.  Id. at 891 ("We are persuaded that Chase adequately disclosed the APRs that the Agreement permitted it to use simply by means of the change-in-terms provision.").  Change-in-terms provisions are entirely

commonplace and are regularly enforced.[13]  See Chase Bank USA, N.A. v. McCoy, 131 S.Ct. 871, 879 (2011) (noting that credit card agreements "routinely" include a general change-in-terms provision giving the card issuer "discretion to change the terms of the contract").

Defendant's January 2009 Cardmember Agreement contained a general change-in-terms provision.  Haug Decl. (Dkt. # 14-4).  Despite the broad discretion defendant obtained from this provision, plaintiff argues that any rate increase was invalid unless the specific justification for the change was previously disclosed.  See Resp. (Dkt. # 23) at 8.  In support of this contention, plaintiff appears to rely on Rubio v. Capital One Bank, 613 F.3d 1195 (9th Cir. 2010).  Id. Plaintiff misinterprets Rubio.  In that case, the defendant's credit card agreement included a change-in-terms provision granting defendant the right to "amend or change any part of [plaintiff's] Agreement, including periodic rates and other charges, or add or remove requirements . . . at any time."  613 F.3d at 1198.  The Court did not quarrel with the language of the change-in-terms provision.  Instead, the Court took issue with the fact that the open-ended change-in-terms provision contradicted the defendant's simultaneous use of the word "fixed" to describe the APR applicable to plaintiff's account.  Id. at 1199, 1203 ("At issue in this case is not Capital One's obligation to disclose the change-in-terms provision, but its obligation to disclose the APR clearly and conspicuously.") (internal quotation omitted).

Here, defendant included a general change-in-terms notice in its January 2009 Cardmember Agreement.  The provision disclosed that defendant retained discretion to alter the Agreement at "any time":

**CHANGES TO THIS AGREEMENT**
We can change this agreement at any time, regardless of whether you have access to your account, by adding deleting, or modifying any provision.  Our right to add,

---

[13] Nothing in TILA or Regulation Z explicitly authorizes creditors to use and rely upon general change-in-terms provisions.  Rather, the conclusion that such provisions pass muster under TILA appears to have resulted from widespread judicial deference—or acquiescence—to a standard banking industry practice.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 14

> delete, or modify provisions includes financial terms, such as the APRs and fees, and other terms such as the nature, extent, and enforcement of the rights and obligations you or we may have relating to this agreement.

Haug Decl. (Dkt. # 14-4) at 9 (emphasis in original). Plaintiff has not identified any materially conflicting provisions, such as promises of fixed APRs. Therefore, under the prevailing interpretation of TILA, defendant's change-in-terms provision satisfied 15 U.S.C. § 1637(a) (requiring creditors to disclose the "conditions under which a finance charge may be imposed"), 12 C.F.R. § 226.6 (2009) (detailing the list of items that `must appear in the initial disclosure statement), and Comment 11 (interpreting § 226 to require disclosure of the "specific event or events that may result in the increased rate"). See Barrer, 566 F.3d at 891.

Whether defendant's change-in-terms notice was "clear and conspicuous" must be analyzed separately. Barrer, 566 F.3d at 888. As noted above, a change-in-terms provision must convey all required information in a "clear and conspicuous" manner. 15 U.S.C. § 1632(a); 12 C.F.R. § 226.5(a)(1) (2009). Stated differently, creditors must disclose required information "in a reasonably understandable form . . . [that is] readily noticeable to the consumer." 12 C.F.R. pt. 226 supp. I, para. 5a(a)(2), cmt. 1 (2009); see also Barrer, 566 F.3d at 892 ("Clear and conspicuous disclosures, therefore, are disclosures that a reasonable cardholder would notice and understand."). Whether a disclosure is clear and conspicuous is ultimately a matter of law for the Court to decide. See Rubio, 613 F.3d at 1200.

In Barrer, the issue of clarity and conspicuousness was at the heart of the Court's decision to remand the case to the district court. Barrer, 566 F.3d at 892. In justifying its decision to remand, the Court pointed to several features of the defendant's cardmember agreement that diminished the clarity and conspicuousness of the agreement's change-in-terms provision:

> It is enough to observe that the change-in-terms provision appears on page 10-11 of the Agreement, five dense pages after the disclosure of the APR. It is neither referenced in nor clearly related to the "Finance Terms" section. This provision, as part of the APRs allowed under the contract, is buried too deeply in the fine print for a reasonable cardholder to realize that, in addition to the specific grounds for increasing the APR listed in the "Finance Charges" section, Chase could raise the APR for other reasons.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 15

Id. Defendant's change-in-terms provision in the present case was similarly buried deep within the Cardmember Agreement. See Haug Decl. (Dkt. # 14-4) at 4-9. Defendant placed the provision immediately after a lengthy arbitration provision and approximately five pages after the section discussing "finance charges." Id. Plaintiff alleges that the Cardmember Agreement was "confusing, couched in legal technicalities, [and] not understandable by the average person." FAC ¶ 59. He also alleges that he was "not aware that Chase Bank included a change of terms clause in the agreement . . . ." Id. ¶ 62. Plaintiff has sufficiently alleged that a reasonable cardholder might fail to notice and understand defendant's disclosures.

Accordingly, the Court finds that plaintiff has stated a claim under 15 U.S.C. § 1632(a) challenging the clarity and conspicuousness of defendant's change-in-terms provision. Recovery will be limited to actual damages. See 15 U.S.C. § 1640(a) (allowing for statutory damages only in certain situations but allowing for actual damages resulting from "any" violation of TILA's credit transactions provisions); see also Barrer v. Chase Bank, USA, N.A., No. 06–415–HA, 2011 WL 1979718, at *1 (D. Or. May 18, 2011) ("[S]tatutory damages are unavailable for claims brought under § 1632(a), the statute concerning *how* information must be disclosed.") (emphasis in original). To recover actual damages, plaintiff must allege detrimental reliance on the change-in-terms provision. In re Ferrell, 539 F.3d 1186, 1192 (9th Cir. 2008). Here, plaintiff's complaint alleges detrimental reliance in a number of places. See FAC ¶¶ 54, 62, 64; see also id. ¶ 84 (alleging entitlement to damages under 15 U.S.C. § 1640).

### *(b) Plaintiff's Retroactivity Allegation*

Plaintiff next alleges that defendant inadequately disclosed its plan to apply future rate increases retroactively. See Resp. (Dkt. # 23) at 8. Plaintiff cites no authority for the proposition that TILA requires such disclosures.[14] Even if such authority existed, the Court

---

[14] Recent changes in federal law have addressed retroactive rate increases. As explained in Part VI(B), however, none of these changes applied to the disclosures at issue in this case.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 16

notes that defendant's January 2009 Cardmember Agreement did disclose the retroactivity of any future rate increases. Page 9 of the Cardmember Agreement specified that, unless defendant stated otherwise, any rate increases promulgated in accordance with the change-in-terms provision "*will apply* to the *unpaid balances* on [plaintiff's] account and to new transactions." Haug Decl. (Dkt. # 14-4) at 9. To the extent that plaintiff seeks to hold defendant accountable for its failure to disclose the retroactivity of its rate increases, that claim is dismissed.

**B. Illegality of Retroactive Rate Increases Under Federal Law**

In his response to defendant's motion, plaintiff argues for the first time that defendant's retroactive rate increase violated the Credit CARD Act of 2009. Resp. (Dkt. # 23) at 12-13 (citing 15 U.S.C. § 1666i-1(b)(1)(c)) ("Limits on interest rate, fee, and finance charge increases applicable to outstanding balances")). However, the provision plaintiff cites did not become effective until February 22, 2010. See 75 Fed. Reg. 7658 (February 22, 2010). Because plaintiff's APR increase took effect well before that date, the Credit CARD Act's provisions do not apply. See Complaint (Dkt. # 1), Ex. A, at 1 (explaining that rate changes would be effective the first day of plaintiff's billing cycle that included October 1, 2009).

Also raised for the first time in plaintiff's response is the argument that "Retroactive Interest Rates have been unlawful under federal law since at least 1938." Resp. (Dkt. # 23) at 13. In support of this argument, plaintiff cites 15 U.S.C. § 45(a)(1), the Federal Trade Commission Act. Id. In the lengthy discussion that follows, plaintiff cites a number of cases and FTC enforcement actions that ostensibly demonstrate the illegality of retroactive rate increases. Id. at 13-19.[15] None of these citations provides any support for plaintiff's

---

[15] The Court notes that plaintiff's discussion on these pages was copied verbatim from public comments prepared by the FTC's Bureau of Consumer Protection in response to an advance notice of proposed rulemaking promulgated by the Office of Thrift Supervision. Compare Resp. (Dkt. # 23) at 13-19 with Letter from Lydia B. Parnes, Director, Bureau of Consumer Protection, et al., to John E. Bowman, Chief Counsel, Office of Thrift Supervision (Dec. 12, 2007), available at http://www.ftc.gov/os/2007/12/P084800anpr.pdf.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 17

contention.[16]  In any event, the Court has no jurisdiction over claims brought under 15 U.S.C. § 45(a)(1), because the FTC Act provides no private cause of action.  See Dreisbach v. Murphy, 658 F.2d 720, 730 (9th Cir. 1981).

## VII.  PLAINTIFF'S STATE LAW CLAIMS

### A.  Breach of Contract and Breach of the Implied Duty of Good Faith and Fair Dealing

Plaintiff alleges that defendant "breached its contractual promise to provide loans at interest rates originally agreed to" when it unilaterally increased the interest rates that it "promised would apply to the loan."  FAC ¶ 44.  This claim fails because the January 2009 Cardmember Agreement explicitly authorized the July 2009 change-in-terms notice and the ensuing rate increase.  See Haug. Decl (Dkt. # 14-4) at 9.  Plaintiff's complaint is devoid of facts suggesting otherwise.  Because plaintiff has not provided any evidence that defendant violated a contractual duty, the Court will dismiss plaintiff's breach of contract claim.  See Carlson v. Hallinan, 925 A.2d 506, 528-29 (Del. Ch. 2006) (party must show violation of a contractual duty to survive dismissal of breach-of-contract claim).[17]

In the alternative, plaintiff alleges that defendant's rate increase violated the implied duty of good faith and fair dealing.  FAC ¶ 72.  More specifically, plaintiff alleges that the opt-out provision in the July 2009 change-in-terms notice served only as an attempt "to coerce Plaintiff and members of the Class to pay their entire loan balances in full prematurely."  Id.; see also id. ¶ 24 (alleging that defendant's opt-out provision would require plaintiff to pay his outstanding

---

[16] For example, plaintiff cites a number of enforcement actions in which credit card companies charged advance fees for credit cards but never provided the cards.  See, e.g., Resp. (Dkt. # 23) at 18 n.35.  Plaintiff also cites a number of federal cases addressing the issue of deceptive advertising.  See, e.g., id. at 16 n. 23. Neither of these fact patterns is at issue here.

[17] The January 2009 Cardmember Agreement contained a provision specifying that plaintiff's account "shall be governed and interpreted in accordance with federal law and, to the extent state law applies, the law of Delaware, without regard to conflict-of-law principles."  Haug. Decl. (Dkt. # 14-4) at 4 (original in all caps).  Plaintiff does not contest the applicability of Delaware law.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 18

balance "immediately"). Plaintiff also alleges that defendant required plaintiff to assume responsibility for defendant's profitability. FAC ¶ 21; Resp. (Dkt. # 23) at 8. Although plaintiff's opt-out allegation seems to contradict the record,[18] the Court will accept it as true for the time being. The Court will also accept as true plaintiff's profitability allegation.

Under Delaware law, the duty of good faith and fair dealing is implied into every contract. Trombley v. Bank of Am. Corp., 715 F. Supp. 2d 290, 295 (D.R.I. 2010); Dunlap v. State Farm Fire and Casualty Co., 878 A.2d 434, 442 (Del. 2005). Defendant argues that plaintiff fails to state a claim because Delaware law plainly authorizes creditors to utilize the very terms that plaintiff seeks to invalidate through the implied duty of good faith and fair dealing. Mot. (Dkt. # 20) at 11-12. In support of this argument, defendant cites § 952 of the Delaware Banking Code, which provides:

> Unless the agreement governing a revolving credit plan otherwise provides, a bank may *at any time* and from time to time amend such agreement *in any respect*, whether or not the amendment or the subject of the amendment was originally contemplated or addressed by the parties . . . . Without limiting the foregoing, such amendment may change terms by the addition of new terms or by the deletion or modification of . . . the rate or rates of periodic interest . . . or other matters of *any kind whatsoever.*

Del. Code Ann. tit. 5, § 952 (2009) (emphasis added).[19]

The Court agrees that Delaware law permits the type of notice and opt-out procedure used by defendant in its July 2009 change-in-terms notice. See Edelist v. MNA Am. Bank, 790 A.2d

---

[18] An inspection of the January 2009 Cardmember Agreement and the July 2009 change-in-terms notice reveals no indication that plaintiff would be required to pay off his balance "immediately"—or even "prematurely"—if he opted out of the changes. Those documents state that plaintiff would merely be responsible for paying off his balance under the terms of his existing agreement. See Haug Decl. (Dkt. #14-4); Compl. (Dkt. # 1), Ex. A.

[19] Under the Banking Code, a creditor must follow certain procedures before unilaterally amending the credit card agreement. First, it must provide at least fifteen days' notice of the change. Del. Code Ann. tit. 5, § 952(b)(1). Second, the creditor must give the cardholder an opportunity to opt out of the change by sending the creditor a rejection letter. Id. § 952(b)(2). Finally, the creditor must allow the cardholder to pay off the accrued balance under the existing APR terms. Id. § 952(b)(2).

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 19

1249, 1257-58 (Del. Super. 2001) ("Delaware statutory law . . . permits [creditors] to unilaterally amend agreements by notice and an opt-out provision") (analyzing Del. Code Ann. tit. 5, §§ 952(b)(1) and (b)(2)).[20] However, the legality of defendant's change-in-terms provision does not automatically trump the implied duty of good faith and fair dealing. Defendant can still be liable for breaching the duty if its conduct "frustrates the overarching purpose of the contract by taking advantage of [defendant's] position to control implementation of the agreement's terms." Dunlap, 878 A.2d at 442. Stated differently, defendant's conduct would violate the duty if defendant "exercised its contractual right to modify in bad faith." In re Chase Bank USA, N.A. "Check Loan" Contract Litig., MDL No. 2032, No. M:09-CV-2032 MMC, 2009 WL 4063349, at *7 (N.D. Cal. Nov. 20, 2009) (denying motion to dismiss).

Arguably, defendant acted in bad faith—or in contravention of the Cardmember Agreement's overarching purpose—when it raised plaintiff's rates primarily out of concern for its profitability. See id., at *8 (allegation that defendant modified underlying credit card agreement due to "underperformance" of plaintiff's account was sufficient to state claim for breach of implied duty of good faith and fair dealing). Given the early stage of the litigation, the Court finds that plaintiff has stated a claim for breach of the implied duty of good faith and fair dealing.

---

[20] In an effort to evade its implications, plaintiff seeks a declaration that § 952 violates the Equal Protection Clause of the Fourteenth Amendment. FAC ¶ 101. According to plaintiff, § 952 is unconstitutional because it "grants a private contract right to one party to an agreement and not the other." However, § 952 easily passes the rational basis test. See Hispanic Taco Vendors of Wash. v. City of Pasco, 790 F. Supp. 1023, 1028 (E.D. Wash. 1991) ("An equal protection or due process challenge to economic regulations will be sustained only if the court is unable to postulate any conceivable rationale for the regulations.") (internal quotation omitted). Defendant claims that the rationale for § 952 is to allow "creditors in open-ended credit relationships the ability to change the terms of credit as market conditions fluctuate and the risk posed by different cardholders changes." Mot. (Dkt. # 20) at 22. Because defendant has articulated at least one conceivable rationale for § 952, there is no way that plaintiff can meet its "burden to negative every conceivable basis that might support it." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993).

**B. Unconscionable Contract**

Plaintiff alleges that the January 2009 Chase Cardmember Agreement is an unenforceable contract of adhesion. FAC ¶ 91. Plaintiff also alleges that the Cardmember Agreement is unconscionable and against public policy. FAC ¶¶ 92-93. Under Delaware law, a contract is unconscionable only when it contains terms that are "so one-sided as to be oppressive." Graham v. State Farm Mut. Auto. Ins. Co., 565 A.2d 908, 912 (Del. 1989) (internal quotation omitted). Plaintiff has not alleged facts sufficient to state a claim under this standard.

In In re Chase Bank USA, N.A. "Check Loan" Contract Litig., plaintiffs alleged that Chase's practice of offering "long term fixed rate loans while simultaneously retaining the right to unilaterally modify the material terms of those loans" was unconscionable under Delaware law. 2009 WL 4063349, at *9. The court dismissed the claim, citing the legality of the practice under Del. Code Ann. tit. 5, § 952,[21] and the protection against exploitation afforded by the implied duty of good faith and fair dealing. Id. Here, plaintiff's unconscionability claim is similarly undermined by the legality of defendant's change-in-terms provision under Delaware law and the availability of relief under the implied duty of good faith and fair dealing. Although these considerations are not dispositive, the Court also notes the threadbare manner in which plaintiff pleaded his claim. See FAC ¶¶ 91-93.[22] Plaintiff may have alleged facts sufficient to state a claim for breach of the implied duty of good faith and fair dealing, but he has not alleged any additional facts showing that the January 2009 Cardmember Agreement was "so one-sided as to be oppressive." Graham, 565 A.2d at 912. Plaintiff has failed to state a claim for

_____

[21] The Court cited Graham, 565 A.2d at 913, for the proposition that courts should not strike down contractual provisions that "adhere[] to the declared public policy of [the] State."

[22] Under the heading "NINTH CAUSE OF ACTION (Unconscionable Contract)," plaintiff alleged as follows: "[¶ 91]. The credit card contracts defendant has with plaintiff are contracts of adhesion. [¶ 92]. The defendants' credit card contracts are against public policy and are unenforceable at law. [¶ 93]. The terms complained of above are unconscionable." These allegations are nothing more than "labels and conclusions." Twombly, 550 U.S. at 555.

1    unconscionability.

2    **C. Violation of the Delaware Banking Code**

3          Plaintiff alleges that defendant's rate increase violated Del. Bank. Code § 944 because

4    defendant's January 2009 Cardmember Agreement did not disclose these changes in a "schedule

5    or formula." FAC ¶¶ 95-96 (citing Del. Code Ann. tit. 5, § 944 (2009) ("Variable rates")).

6    Plaintiff's argument fails because the rate increase at issue in this case resulted from the change-

7    in-terms notice mailed by defendant in July 2009. Section 944 of the Banking Code only

8    governs interest rate increases occurring by operation of the existing agreement. Id. (authorizing

9    changes to interest rates "[i]f the agreement governing the revolving credit plan so provides").

10   The Court agrees with defendant that § 944 is inapplicable. See Mot. (Dkt. # 20) at 20. As

11   described above, the section of the Banking Code that governs the July 2009 change-in-terms

12   notice is § 952 ("Amendment of agreement"). Plaintiff has not alleged a violation of § 952.

13   Thus, to the extent plaintiff challenges defendant's compliance with § 944, that claim is

14   dismissed.

15   **D. Negligent Misrepresentation and Fraud**

16         Plaintiff alleges that defendant falsely represented that "[plaintiff's] interest rates

17   '[would] not be impacted by' the changes to the loan terms set forth in [defendant's] 'notices.' "

18   FAC ¶ 48, 58. Plaintiff further alleges that defendant made this representation knowingly, and

19   that it fraudulently took advantage of its superior bargaining position to lure consumers into

20   confusing and undecipherable credit card contracts. Id. ¶¶ 59, 61. These actions, plaintiff

21   alleges, constitute negligent misrepresentation, fraud, or both.

22         On a motion to dismiss, the Court must accept all factual allegations as true. Manzarek,

23   519 F.3d at 1031. However, the Court is "not bound to accept as true a legal conclusion couched

24   as a factual allegation." Iqbal, 129 S.Ct. at 1950 (internal quotation omitted). Here, plaintiff has

25   not provided any evidence that defendant promised him a permanently fixed APR. A thorough

26

27   ORDER GRANTING IN PART AND DENYING
     IN PART DEFENDANT'S MOTION TO
28   DISMISS - 22

investigation of the January 2009 Cardmember Agreement failed to reveal a single instance in which defendant represented that plaintiff's interest rates "will not be impacted" by the changes to the loan terms set forth in defendant's "notices." See Haug Decl. (Dkt. # 14-4). Dismissal of plaintiff's negligent misrepresentation claim is warranted because plaintiff failed to plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. This conclusion applies with even more force to plaintiff's fraud claim, given the heightened pleading standard of Fed. R. Civ. P. 9(b). See Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (a complaint alleging fraud must provide "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.") (internal quotation marks omitted).

**E. Washington Consumer Protection Act ("CPA")**

Plaintiff alleges that defendant "engaged in unfair or deceptive acts and practices in violation of Chapter 19.86 RCW [the Washington Consumer Protection Act] by applying unlawful or unenforceable contract terms as defined by 15 U.S.C. § 45(a)(1) and common law to plaintiff's existing balance." FAC ¶ 89. Defendant argues, and the Court agrees, that plaintiff's allegation fails to meet the most basic pleading standard. See Mot. (Dkt. # 20) at 18 ("[Plaintiff] fails to allege anything specific about his claim—neither supporting facts nor any specific legal rule that allegedly was violated."). Under Twombly, a well-pleaded complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Plaintiff's unfair practices claim is entirely conclusory,[23] and it must be dismissed.

---

[23] To state a claim under the CPA, plaintiff must plead facts demonstrating: (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to the plaintiff in his or her business or property, and (5) which injury is causally linked to the unfair or deceptive act. Indus. Indem. Co. v. Kallevig, 114 Wn.2d 907, 920-21 (1990).

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 23

**F. Illusory Promise**

Plaintiff alleges that the January 2009 Cardmember Agreement is unenforceable because its general change-in-terms provision "constitutes an unlimited right" that effectively "destroys the promised 9.99% APR" disclosed in plaintiff's original agreement with WaMu. FAC ¶ 99. Plaintiff seeks to void the Cardmember Agreement on the theory that it contained unenforceable "illusory promises."[24] Id.

In Barrer, the Ninth Circuit rejected a similar line of reasoning. There, the majority took up the issue of illusory promises while responding to concerns raised by Judge Graber's partial dissent. Judge Graber opined that the general change-in-terms provision at issue unacceptably allowed the defendant to "raise [plaintiff's] APR for any reason, however bizarre or unexpected, without informing them that it intends to do so." Barrer, 566 F.3d at 893 (Graber, C.J., concurring in part and dissenting in part). The majority disagreed. In a footnote, it expressed "doubt" that "Regulation Z would permit a creditor to use a general change-in-terms provision to punish a cardholder on any whim whatsoever." Id. at 891 n.9. Until banks began "pricing credit on the basis of hair color or any other peccadillo that might offend some over-punctilious creditor," the majority concluded, there was no reason to assume that Regulation Z failed to provide sufficient protection against unlimited creditor discretion. Id.[25]

Here, plaintiff has similarly failed to demonstrate the existence of unlimited unilateral discretion. The Cardmember Agreement bound defendant just as it bound plaintiff. For

---

[24] According to one Delaware court, "[t]he underlying question in cases involving 'illusory' promises is consideration . . . Where the plaintiff's promise is a mere illusion, that is, where his promise exists in form only but not in substance, then it follows necessarily that there is no consideration to support the defendant's promise, and thus no enforceable contract." Mobil Oil Corp. v. Wroten, 303 A.2d 698 (Del. Ch. 1973).

[25] The majority further justified its stance by explaining that "pricing credit on the basis of cardholder risk [without prior disclosure of the practice] is how credit card companies normally do business." Barrer, 566 F.3d at 891 n.9. In other words, the majority's dismissal of Judge Graber's concerns was at least partially grounded in its deference to standard banking practice.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 24

example, the Cardmember Agreement required defendant to notify plaintiff of any change in the terms of the agreement, as required by applicable law.  Haug. Decl (Dkt. #14-4) at 9. Defendant's July 2009 change-in-terms notice complied with applicable law by informing plaintiff about impending modifications to the Cardmember Agreement and about his right to opt out of the changes.  <u>See</u> Complaint (Dkt. # 1), Ex. A; <u>see also</u> Mot. (Dkt. # 20) (discussing the fact that Del. Bank. Code § 952 required defendant to provide at least 15 days' notice of an impending APR increase, as well as an opportunity to opt out).  The change-in-terms notice was thus an invitation to enter into a new relationship governed by the modified terms.  Plaintiff accepted this invitation by failing to opt out and by continuing to use his card.  <u>See</u> FAC ¶¶ 27-28.  Plaintiff cannot now complain that defendant retained an "unlimited right to decide later the nature or extent of its performance."  <u>Console Master Speaker Corp. v. Muskegon Wood Prods. Corp.</u>, 138 A. 598, 599 (Del. Super. 1927).  Plaintiff's illusory promise cause of action is dismissed.

**G.  Unjust enrichment**

Plaintiff alleges that defendant "unjustly received a benefit at the expense of Plaintiff and Class members."  FAC ¶ 66.  Under Delaware law, a claim for unjust enrichment requires "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."  <u>In re Chase Bank USA, N.A. "Check Loan" Contract Litig.</u>, 2009 WL 4063349, at *11 (quoting <u>BAE Sys. Info. and Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.</u>, 2009 WL 264088, at *7 (Del. Ch. 2009)).  Before turning to these elements, the Court must make a "threshold inquiry" into whether a comprehensive contract governs the parties' dispute.  <u>BAE Sys.</u>, 2009 WL 264088, at *7.  If so, then no claim for unjust enrichment will lie.  <u>See</u> <u>Kuroda v. SPJS Holdings, L.L.C.</u>, 971 A.2d 872, 891 (Del. Ch. 2009) ("A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to

the unjust enrichment claim."). Having dismissed all claims affecting the validity of the January 2009 Cardmember Agreement, the Court finds that plaintiff's dispute with defendant was governed by that document. The Cardmember Agreement is the measure of plaintiff's right to recovery, and plaintiff's unjust enrichment claim is dismissed.

**H. Declaratory Relief**

Finally, plaintiff seeks a declaration finding that any arbitration agreement found in the January 2009 Cardmember Agreement is unconscionable and against public policy. FAC ¶¶ 85-86. Defendant has already waived its right to invoke the Cardmember Agreement's arbitration clause. See Mot. (Dkt. # 20) at 23 n.17. Accordingly, the Court dismisses plaintiff's claim for declaratory judgment as moot.

## VIII. CONCLUSION

For the foregoing reasons, defendant's motion to dismiss (Dkt. # 20) is GRANTED in part and DENIED in part, as follows:

(1) **Claims dismissed under Fed. R. Civ. P. 12(b)(1):** Plaintiff's claims based on WaMu's pre-receivership acts or omissions are hereby dismissed with prejudice for lack of subject matter jurisdiction;

(2) **Claims dismissed under Fed. R. Civ. P. 12(b)(6):** Plaintiff's TILA claims, to the extent that they challenge the substance of defendant's disclosures under 15 U.S.C. §1637(a) and 12 C.F.R. § 226.6 (2009), are dismissed for failure to state a claim upon which relief can be granted. Plaintiff's federal claims arising under the Credit CARD Act and the FTC Act, to the extent plaintiff intended to bring them, are dismissed for the same reason. Plaintiff's state-law claims for breach of contract, unconscionable contract, violation of the Delaware Banking Code, negligent misrepresentation, fraud, unjust enrichment, Washington Consumer Protection Act, and illusory promise, are also dismissed for failure to state a claim;

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS - 26

1

(3)    **Claims dismissed as moot:** Plaintiff's request for declaratory relief is dismissed

2      as moot;

3

(4)    **Surviving claims:** Plaintiff has stated a claim under 15 U.S.C. § 1632(a)

4      challenging the clarity and conspicuousness of the change-in-terms provision

5      located on page nine of defendant's January 2009 Cardmember Agreement

6      (Dkt. # 14-4). Plaintiff has also stated a claim for breach of the implied duty of

7      good faith and fair dealing.

8

9      Dated this 7th day of June, 2011.

10

11     *Mn S Lasnik*

12

13     Robert S. Lasnik
       United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27     ORDER GRANTING IN PART AND DENYING
       IN PART DEFENDANT'S MOTION TO
28     DISMISS - 27