1    THE HONORABLE ROBERT S. LASNIK

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
8                              AT SEATTLE

9    BRION ROCKWELL,                    )
                                        )
10                     Plaintiff,       )    Case No.  2:10-CV-01602 RSL
                                        )
11        v.                            )    **DECLARATION OF VICTOR
                                        )    STANGO IN SUPPORT OF**
12    CHASE BANK,                        )    **DEFENDANT'S OPPOSITION TO**
                                        )    **PLAINTIFF'S MOTION FOR**
13                     Defendant.       )    **CLASS CERTIFICATION**
                                        )
14    _____       )

15

16

17

18

19

20

21

22

23

24

25

26    DECLARATION OF                           **LANE POWELL** PC
                                        1420 Fifth Avenue, Suite 4100
27    VICTOR STANGO                      Seattle, Washington  98101-2338
      CASE NO. 2:10-CV-01602            206.223.7000 fax: 206.223.7107
28

1

2

# TABLE OF CONTENTS

3    I.      Qualifications ...................................................................................................1

4    II.     Assignment and Summary of Opinions ............................................................1

5    III.    Materials and Data Relied Upon ......................................................................2

6    IV.     Economic Research Provides Direct Evidence of Diverse Cardholder Expectations
        Concerning Repricing and the Right to Opt Out That Would Apply to Members of the
7        Putative Class ...................................................................................................3

8    V.      Sources of Observed Diversity in Consumer Expectations About Repricing and Opt
        Out Would Apply to Cardholders in the Putative Class .....................................6

9
              A.      Members of the Putative Class Would Have Held Diverse Expectations
10                   Based on Differences in Attention to Bank Disclosures...................7

11            B.      Members of the Putative Class Would Have Held Diverse Expectations
                   Based on Differing Past Experiences With Credit Cards ...............12

12
              C.      Members of the Putative Class Would Have Held Diverse Expectations
13                   Based on Differences in Attending to Third Party Sources of Information
                   about Credit Card Terms.................................................................16

14
     VI.     Conclusion: Determining Actual Cardholder Expectations Would Require an
15        Individualized Inquiry.....................................................................................21

16

17

18

19

20

21

22

23

24

25

26

27    DECLARATION OF
      VICTOR STANGO
28    CASE NO. 2:10-CV-01602

**LANE POWELL PC**
1420 Fifth Avenue, Suite 4100
Seattle, Washington  98101-2338
206.223.7000 fax: 206.223.7107

I, Victor Stango, declare as follows:

## I.    Qualifications

1.    I am an Associate Professor of Management at the University of California, Davis. Since receiving my Ph.D. in Economics from the University of California, Davis in 1996, I have taught at the Tuck School of Business at Dartmouth College, the Graduate School of Business at University of Chicago, the Haas School of Business at University of California, Berkeley, and the University of Tennessee. I have also been an Economist / Senior Economist at the Federal Reserve Bank of Chicago, and a Visiting Senior Economist at the Federal Reserve Bank of New York.

2.    I am an expert in household finance. My current research focuses on household financial decision making over both short and long term time horizons. I have published more than a dozen articles in leading academic finance and economics journals including *American Economic Review*, the *Journal of Finance*, and the *Review of Financial Studies*, and co-authored several book chapters. Several of my published papers are studies of the credit card market. I have received grants from National Science Foundation, Russell Sage Foundation, NET Institute, Filene Institute and FDIC in support of my research.

3.    Appendix A contains my curriculum vitae and outlines my experience in this area, including a list of my publications and presentations. I have not testified at trial or deposition in the last four years. I am being compensated at the rate of $950 per hour. My compensation is in no way affected by the outcome of this case or by the opinions I provide.

## II.    Assignment and Summary of Opinions

4.    I have been asked by counsel for Chase Bank USA, N.A. ("Chase") to address economic issues related to class certification. In particular, I have been asked to opine on the anticipated uniformity or variety of putative class members' actual expectations about whether, under the terms of the cardmember agreement ("CMA"), Chase could propose (with a right to

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

1

1    opt out) to raise the APR applicable to existing and new account balances. This practice is a form

2    of what is commonly referred to as "repricing."

3         5.     Based on the economic literature and my own research, I conclude that putative

4    class members would be anticipated to have held widely diverse expectations concerning

5    whether Chase could propose to reprice accounts pursuant to the CMA. Specifically, economic

6    research in the field of household finance provides direct evidence of diverse actual consumer

7    expectations about whether a credit card issuer could propose to reprice accounts. In addition,

8    well-known sources of consumer diversity in expectations—including individual-level variation

9    in cardholders' attention to disclosures, cardholders' experiences with other financial institutions,

10    and cardholders' use of information from sources like media and financial advisors—all apply to

11    the putative class here. The deposition testimony of named plaintiff Brion Rockwell—

12    concerning his history of dealings with WaMu and Chase (and other banks), how little attention

13    he paid to Chase (and other card issuer) disclosures, and the role of other information sources

14    like the media and conversations with friends/acquaintances—illustrates dimensions of diversity

15    that would be seen throughout the class and is emblematic of the need for individualized inquiry

16    to elicit actual expectations. I thus conclude that determining the actual expectations of any

17    particular putative class member would require conducting an individualized inquiry.

18    **III.    Materials and Data Relied Upon**

19         6.     In the course of performing my assignment and reaching the conclusions

20    summarized above and elaborated below, I have relied upon various materials, including public

21    surveys, academic literature, and the deposition of Brion Rockwell. I have also reviewed various

22    pleadings. The list of materials that I relied upon for this report is contained in Appendix B.

23

24

25

26

27    DECLARATION OF
     VICTOR STANGO

28    CASE NO. 2:10-CV-01602

## IV.    Economic Research Provides Direct Evidence of Diverse Cardholder Expectations Concerning Repricing and the Right to Opt Out That Would Apply to Members of the Putative Class

7.      Diversity in how individuals approach and make financial decisions is a foundational tenet in the field of household finance, which is the field in economics and related disciplines that pertains most directly to my assignment. It is an accepted view in household finance to recognize "the complexity of human cognition and the incredible variation in attitudes, beliefs, intelligence and experience among consumers."[1] As explained in a 2011 Federal Reserve Bulletin article relating to financial disclosures, "[c]onsumer decisions are affected not only by the broad context of the consumer's economic, social, cultural, and political environment but also by more personal psychological and socioeconomic factors."[2] The same article further states that "individual differences in experience, expertise, and self-confidence affect how consumers process information."[3] One author of a recent study of disclosure in mortgage markets by two FTC economists put it this way: "Differences among people complicate analysis…people are unique! "[4] The author continues, saying that "[s]o many unobservable factors affect choice."[5]

8.      Available evidence from economic research shows—consistent with these accepted tenets of household finance—that consumers such as those in the putative class in this case in fact do hold diverse actual expectations about credit card repricing, including,

---

[1] Rachlinski, J. (2006), "Cognitive Errors, Individual Differences, and Paternalism," *University of Chicago Law Review*, 73:1, p. 208.

[2] Hogarth, J., and E. A. Merry (2011), "Designing Disclosures to Inform Consumer Financial Decisionmaking: Lessons Learned from Consumer Testing," *Federal Reserve Bulletin*, 97:3, p. 3.

[3] *Id.*

[4] Pappalardo, J. K., *Promise and Pitfalls of Consumer Mortgage Disclosures*, Federal Reserve Bank of New York, January 6, 2010, available http://www.newyorkfed.org/banking/Pappalardo_Promise_Pitfalls_%20of_Consumer_Mortgage_Disclosures.pdf (last accessed: June 16, 2012), p. 19.

[5] Pappalardo, J. K., *Promise and Pitfalls of Consumer Mortgage Disclosures*, Federal Reserve Bank of New York, January 6, 2010, available http://www.newyorkfed.org/banking/Pappalardo_Promise_Pitfalls_%20of_Consumer_Mortgage_Disclosures.pdf (last accessed: June 16, 2012), p. 21.

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington  98101-2338
206.223.7000 fax: 206.223.7107

3

1  specifically, diverse expectations about what I understand to be the main issues in this case:

2  whether a bank may propose to reprice an account and whether a cardholder has the right to opt

3  out.

4        9.      Diversity in actual expectations concerning repricing has been shown in studies

5  commissioned by the Federal Reserve, focusing on cardholders' use of, and interpretation of,

6  credit card disclosures. It is worth noting that the methodological approach taken by these studies

7  begins with "qualitative studies" that involve highly individualized inquiry. These qualitative

8  studies show that cardholders hold various differing expectations regarding repricing, and that

9  such variety includes expectations that issuers may propose changes in APRs. For example:

- "One of the Schumer Box models used in Philadelphia included a row titled 'Other Reasons Your APRs May Change' that indicated that the issuer could change the APRs shown for any reason. Only 2 of 8 participants noticed this row, and most said that even if the row did not appear in the Schumer Box they would still assume that the bank could change the APRs at any time."[6]

- Furthermore, "Even after reading the list of specific triggers in the Penalty APR row, several participants assumed that the Penalty APR could be charged even in situations not described…. One suspected that despite what the Schumer Box said, the bank could apply the Penalty APR at any time it wished."[7]

- "A few participants said that banks could also change these rates for other reasons if they wished."[8]

---

[6] *Design and Testing of Effective Truth in Lending Disclosures: Findings from Qualitative Consumer Research*, Macro International Inc., December 15, 2008, p. vi.

[7] *Design and Testing of Effective Truth in Lending Disclosures: Findings from Qualitative Consumer Research*, Macro International Inc., December 15, 2008, p. 5. Emphasis added.

[8] *Design and Testing of Effective Truth in Lending Disclosures*, Macro International, May 16, 2007, p. 10.

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

4

10.    In some cases these views were held by "most" participants. Responses from these studies clearly indicate that cardholders' actual expectations are diverse, and that such diversity includes an expectation that a credit card issuer might "change the APRs at any time,"[9] and that "the Penalty APR could be charged even in situations not described" in "the list of specific triggers in the Penalty APR row."[10]

11.    Cardholders may view changes in terms and repricing as part of the ordinary course of events in the credit card market. One survey asked consumers about repricing: "[a]mong the 272 respondents who said their terms or pricing had changed, 57 percent said the changes did not change their opinion of their issuer. Among the 42 percent, however, who said there was an impact, 60 percent of them reported a change in their opinion of the issuer for the worse and 36 percent said it was better."[11]

12.    Any assumption that cardholders uniformly expect that APR changes do not apply to existing balances is unsupported by evidence and contrary to accepted views of behavior in household finance. As noted herein, experience is a determinant of understanding regarding account terms. It is also clear that in prior years nearly all accounts applied APR changes retroactively prior to February 2010. The Pew Charitable Trusts found in October 2009 that "99.7 percent of bank cards allowed the issuer to raise interest rates on outstanding balances by changing the account agreement unilaterally—up from 93 percent in December 2008."[12] The

---

[9] *Design and Testing of Effective Truth in Lending Disclosures: Findings from Qualitative Consumer Research*, Macro International Inc., December 15, 2008, p. vi. Emphasis added.

[10] *Design and Testing of Effective Truth in Lending Disclosures: Findings from Qualitative Consumer Research*, Macro International Inc., December 15, 2008, p. 5. Emphasis added.

[11] "Credit cardholders have little awareness of changes in their cardholder agreements," *Institute of Consumer Financial Education*, November 14, 2003, available at http://www.financial-education-icfe.org/financial_news_press_releases/2003/20031114_credit_cardholders_have_little_awareness.asp (last accessed: June 26, 2012).

[12] Based on a research study of application disclosures for "nearly 400 credit cards offered by the largest 12 bank and largest 12 credit union issuers" ("Still Waiting: 'Unfair or Deceptive' Credit Card Practices Continue as Americans Wait for New Reforms to Take Effect," The Pew Health Group, October 2009, available at http://www.pewtrusts.org/uploadedFiles/wwwpewtrustsorg/Reports/Credit_Cards/Pew_Credit_Cards_Oct09_Final.pdf (last accessed: June 26, 2012)).

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

same study observed that "90 percent of bank cards had penalty interest rates that could be triggered by late payments or overlimit transactions."[13] Given the frequency with which credit card accounts are repriced for various reasons,[14] the consequent experience many cardholders have with repricing, and the near-universality of retroactive application of APR changes, an assumption that no cardholders learned from past experience that APR changes apply to existing balances is unwarranted.

13.    Finally, economic research evinces diversity in consumer awareness that proposals to change terms can come with an opt-out: "Models used in Philadelphia offered participants the right to 'opt out' of the changes in interest rates and account terms shown but explained that by opting out, the card could no longer be used. Almost all participants understood what this meant, although one did not understand that by opting out (s)he would no longer be able to use the card. Most participants indicated that they would opt out rather than accepting the changes to their rates and other terms."[15]

## V.    Sources of Observed Diversity in Consumer Expectations About Repricing and Opt Out Would Apply to Cardholders in the Putative Class

14.    In my professional opinion, one cannot seriously dispute that the members of the putative class in this case would have held diverse actual expectations about whether Chase could propose to reprice their accounts under the terms of their CMAs, whether any such proposed repricing could apply to existing balances, and whether a cardholder could elect to opt out of a proposed change.

---

[13] "Still Waiting: 'Unfair or Deceptive' Credit Card Practices Continue as Americans Wait for New Reforms to Take Effect," The Pew Health Group, October 2009, available at http://www.pewtrusts.org/uploadedFiles/wwwpewtrustsorg/Reports/Credit_Cards/Pew_Credit_Cards_Oct09_Final.pdf (last accessed: June 26, 2012).

[14] "CARD Act Factsheet," *Consumer Financial Protection Bureau,* February 22, 2011, available at http://www.consumerfinance.gov/credit-cards/credit-card-act/feb2011-factsheet/ (last accessed: June 26, 2012).

[15] *Design and Testing of Effective Truth in Lending Disclosures: Findings from Qualitative Consumer Research,* Macro International Inc., December 15, 2008, p. viii.

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

**LANE POWELL** PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

15.     I base this conclusion on the direct evidence in the economic research discussed above, and the fact that accepted sources of diversity in expectations as to these issues all apply to the members of the putative class in this case. There is great diversity in how consumers hold and use credit cards,[16] which in turn derives from diversity in economic circumstances such as income and age, as well as preferences for risk, expectations about future economic circumstances, and other "decision inputs."[17] It is an accepted conclusion in household finance that diverse sources shape learning about financial products in general,[18] and that consumers acquire information about credit cards from a variety of sources.[19] These sources include disclosures and other communications from banks, prior experience with the same financial product, and other sources such as friends and family, the media, the Internet, and employers.[20] All of these sources of diversity shape differing cardholder expectations, and would lead to diversity in actual expectations among the members of the putative class. This conclusion is further supported by the testimony of named plaintiff Brion Rockwell, who exemplifies the impact of these diverse sources on expectations.

A.     **Members of the Putative Class Would Have Held Diverse Expectations Based on Differences in Attention to Bank Disclosures**

16.     Diversity in how credit card holders acquire and attend to information and disclosures provided by card issuers would have generated diversity in expectations among

---

[16] Durkin, T. A. (2000), "Credit Cards: Use and Consumer Attitudes, 1970–2000," *Federal Reserve Bulletin*, 86:9.

[17] Benton, M., S. Meier, and C. Sprenger (2007), "Overborrowing and Undersaving: Lessons and Policy Implications from Research in Behavioral Economics," *Federal Reserve Bank of Boston Discussion Paper*, No. 2007-4.

[18] Hilgert, M., J. Hogarth, and S. Beverly (2003), "Household Financial Management: The Connection between Knowledge and Behavior," *Federal Reserve Bulletin*, 89:7, 309–322. See also Bricker, J., A. B. Kennickell, K. B. Moore, and J. Sabelhaus (2012), "Changes in U.S. Family Finances from 2007 to 2010: Evidence from the Survey of Consumer Finances," *Federal Reserve Bulletin*, 98:2.

[19] Hilgert, M., J. Hogarth, and S. Beverly (2003), "Household Financial Management: The Connection between Knowledge and Behavior," *Federal Reserve Bulletin*, 89:7, p. 318.

[20] Hogarth, J., and E. A. Merry (2011), "Designing Disclosures to Inform Consumer Financial Decisionmaking: Lessons Learned from Consumer Testing," *Federal Reserve Bulletin*, 97:3, pp. 14, 24.

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

members of the putative class. Considerable empirical evidence shows that credit card customers differ in their attention to disclosures and other related sources of information about credit cards. Consumers differ regarding "whether they [try] to obtain information" and "information they would like to have" when opening a credit card account.[21] Calem and Mester (1995) document substantial variation in consumers' willingness to comparison shop for credit cards.[22] The Federal Reserve reports considerable heterogeneity in whether "people read Truth in Lending statements carefully."[23] A survey of consumer opinions about credit cards suggests that some people obtain information about credit cards from email (66% of the respondents), some from postal mail (40%), while others find that information on the credit card companies' websites (20%).[24]

17.    Diversity extends to attentiveness to ongoing disclosures, which would include Changes in Terms notices associated with repricing. A Federal Reserve study asked customers to report "how often they examined the pricing and other disclosures they received monthly as part of the periodic statements from the card- issuing bank."[25] The article then goes on to say that "[c]ustomers gave the full range of possible answers to the question on how often they examine the annual percentage rates (APRs)."[26] Responses regarding other "descriptive material" also take on the full range of possible values. The same study states that "many holders of bank-type

[21] Durkin, T. A. (2002), "Consumers and Credit Disclosures: Credit Cards and Credit Insurance," *Federal Reserve Bulletin*, 88:4, Table 2.
[22] Calem, P., and L. Mester (1995), "Consumer Behavior and the Stickiness of Credit-Card Interest Rates," *The American Economic Review*, 85:5, 1327–1336.
[23] Durkin, T. A. (2002), "Consumers and Credit Disclosures: Credit Cards and Credit Insurance," *Federal Reserve Bulletin*, 88:4, Table 9.
[24] *Recharging Credit Card Marketing to Meet Evolving Customer Expectations*, Epsilon, July 2010, p. 5.
[25] Durkin, T.A. (2006), "Credit Card Disclosures, Solicitations, and Privacy Notices: Survey Results of Consumer Knowledge and Behavior," *Federal Reserve Bulletin*, 92:8, p. A111.
[26] Durkin, T.A. (2006), "Credit Card Disclosures, Solicitations, and Privacy Notices: Survey Results of Consumer Knowledge and Behavior," *Federal Reserve Bulletin*, 92:8, p. A111.

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

8

1  credit cards look at the disclosures fairly often."[27] The same survey also shows considerable

2  diversity in the terms within disclosures that customers examine more or less frequently.[28]

3      18.    A Federal Reserve study says: "When shown a sample cardholder agreement, few

4  of the participants said they would read the entire document if they received it. Others said that

5  they would skim it and look for what they felt were the most important headings. In each group

6  about half of participants said that they would not look at the cardholder agreement at all."[29]

7      19.    Diversity also extends specifically to the Changes in Terms notices that would

8  describe repricing: "In Philadelphia, about half of participants who saw a statement that

9  described impending changes to account terms understood what it was saying."[30]

10      20.    The testimony of Brion Rockwell is emblematic of these types of diversity based

11  on attention to bank disclosures, and also illustrates that Mr. Rockwell's expectations are

12  unlikely to reflect the full range of diverse expectations in the putative class. For example,

13  numerous times in his deposition, Mr. Rockwell testified that he did not read various disclosures

14  from WaMu and Chase regarding his credit card.[31] These included CMAs containing various

15  terms regarding changes to the account (including APRs), and Change in Terms notices that

16  included opt-out provisions. Mr. Rockwell testified that he understood that the CMAs (first from

17  WaMu, then from Chase) governed his use of his card.[32] Not having read any of the disclosures,

18  including the relevant CMAs and July 2009 Changes in Terms notice, Mr. Rockwell did not

19  form any expectations based on their contents, and he did not recall relying on anything in the

---

[27] Durkin, T.A. (2006), "Credit Card Disclosures, Solicitations, and Privacy Notices: Survey Results of Consumer Knowledge and Behavior," *Federal Reserve Bulletin*, 92:8, p. A115.

[28] Durkin, T.A. (2006), "Credit Card Disclosures, Solicitations, and Privacy Notices: Survey Results of Consumer Knowledge and Behavior," *Federal Reserve Bulletin*, 92:8, Table 3.

[29] *Design and Testing of Effective Truth in Lending Disclosures*, Macro International Inc., May 16, 2007, p. 6.

[30] *Design and Testing of Effective Truth in Lending Disclosures: Findings from Qualitative Consumer Research*, Macro International Inc., December 15, 2008, p. viii.

[31] Deposition of Brion Rockwell on June 18, 2012 ("Rockwell Deposition"), at 151:8 – 15, 182:21 – 24, 203:3 – 5, 140:12 – 21, 143:9 – 12, 145:13 – 14, 146:22 – 147:8, 148:13 – 14, 38:14 – 41:7, 94:11 – 95:9, 117:17 – 118:17, 124:3 – 23. Cited portions of the Rockwell Deposition are attached hereto as Appendix C.

[32] Rockwell Deposition, 91:11 – 94:4.

27  DECLARATION OF
VICTOR STANGO
28  CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

9

1    CMA in using his card.[33] When asked about his expectations in July 2009—when Chase actually

2    proposed the APR increase (with an opportunity to opt out)—he testified that he had no

3    expectations one way or the other.[34] He stated: "I don't recall having any expectations, except

4    that I believe I remembered it being a zero introduction, then up to 9.99 percent."[35]

5         21.    The research discussed above implies that many other putative class members

6    would have taken a different approach, thus developing different expectations from Mr.

7    Rockwell. Expectations would vary depending on whether a putative class member read or

8    studied the relevant CMAs and Change in Terms notices, and if so, which portions of the

9    documents they read.

10        22.    For example, various sections of Chase (and other) CMAs describe terms relevant

11   to APR and changes in APR. The Finance Charges section of the WaMu agreement that

12   originally governed Mr. Rockwell's account outlines a number of APRs (Standard APRs,

13   Default APRs) and fees.[36] In the WaMu CMA, the Account Changes section states (partially in

14   bold): "We have the right to change any part of this Agreement or add or remove any term,

15   condition, or requirement."[37] The Changes To This Agreement section of the Chase CMA that

16   initially replaced Mr. Rockwell's WaMu CMA contains similar language. It states: "Our right to

---

[33] Rockwell Deposition, 95:10 – 20.

[34] Rockwell Deposition, 88:3 – 89:11, 138:20 – 139:15.

[35] Rockwell Deposition, 94:8 – 10.

[36] WaMu Account Agreement (Dkt. # 14-3), p.3.

[37] WaMu Account Agreement (Dkt. # 14-3), p.4. The section continues: "If permitted by law, the change may be applied to any Account balance existing at the time of the change. … From time to time, we may review your Account. Based on these reviews, we may decide to change your Account terms, including APRs and fees. In determining whether to change your Account terms we consider your Account history with us, including your record of making timely payments, staying within established credit lines, and other indications of responsible Account usage. We also consider your overall credit risk, as reflected by a variety of internal and external credit scoring models. These models consider your performance on accounts with Washington Mutual and other creditors. If a change is made that increases the APR or APRs that apply to your Account, you will be given an opportunity to avoid the change by closing your Account and paying off any existing balance under the terms in effect prior to the change." A statement about changes to the APR is also found in bold on the Terms and Conditions sheet. There it states: "We may change the APRs, fees, and other terms of your account at any time to the extent permitted by applicable law and the Account Agreement." WaMu Preapproval Solicitation (Dkt. # 14-1), p. 3

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

10

1    add, delete, or modify provisions includes financial terms, such as the APRs and fees," and

2    "Unless we state otherwise, any Change will apply to the unpaid balances on your account and to

3    new transactions."[38] The July 2009 Change in Terms notice sent to Mr. Rockwell and others in

4    the putative class outlined the proposed changes, including the fact that the new APR would

5    "apply to all current and future balances on your account" and that the cardmember could opt out

6    of the proposed change.[39]

7        23.    The communications regarding the CMAs and Change in Terms were also

8    explicit about their importance, and the importance of reading them carefully. For example, Mr.

9    Rockwell's WaMu CMA states: "You should read all of this information carefully and keep it

10    for your records."[40] Further, the letter sent to Mr. Rockwell in January 2009 when his WaMu

11    account was converted to Chase stated in bold: "please read the Cardmember Agreement

12    carefully and keep it with your other important account papers."[41] The Change in Terms notice

13    sent to Mr. Rockwell in July 2009, stated in bold: "Please read below about your right to choose

14    not to accept certain changes by cancelling your account."[42] It also stated: "Please read all of the

15    information and keep this notice for your records."[43]

16        24.    Although Mr. Rockwell testified that he did not read any of the disclosures when

17    he received them, given the varying approaches taken by cardholders to reading such disclosures,

18    an assumption that all cardholders in the putative class would have identically ignored

19    disclosures is unwarranted. A more natural and plausible assumption is that some putative class

20

---

21    [38] January 2009 Chase Conversion Letter and Cardmember Agreement (Dkt. # 14-4), p. 9.

22    [39] July 2009 Change in Terms Notice (Dkt. # 14-5), p. 2. For example, the Change in Terms notice sent to Mr.
    Rockwell in July 2009 stated that if he wanted to opt out of the proposed APR increase he had to inform Chase

23        by August 19, 2009. If he did not opt out the new APR would be effective the first day of his billing cycle that
    included October 1, 2009.

24    [40] WaMu Account Agreement (Dkt. # 14-3), p. 2
    [41] January 2009 Chase Conversion Letter and Cardmember Agreement (Dkt. # 14-4), p. 2.

25    [42] July 2009 Change in Terms Notice (Dkt. # 14-5), p. 2.
    [43] July 2009 Change in Terms Notice (Dkt. # 14-5), p. 2.

26

27    DECLARATION OF
    VICTOR STANGO

28    CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

members would have read the relevant documents, while others would not have, resulting in significant variation in actual expectations. Mr. Rockwell himself seemed to recognize the likelihood of diversity based on differing attention to information. For example, when, during the deposition, he was taken through various terms in both the CMAs, the Change in Terms notices, and other communications, Mr. Rockwell agreed that although he had not read the terms at the time he received them, it was possible that "someone's understanding of the terms of this agreement [the WaMu CMA] would depend on how much of it that they read."[44] He similarly agreed regarding the opt out provision in the Change in Terms notice.[45] Furthermore, when specific language was reviewed with him during the deposition, Mr. Rockwell allowed that others might understand various specific parts of the original WaMu solicitation, the WaMu and Chase CMAs, and the Changes in Terms notices.[46] In particular, he testified that an opt out provision that allowed a cardmember to choose between accepting a higher APR and continuing to use the card, or opting out and paying off the existing balance at the existing terms of the CMA, was "possibly fair"[47] and that it "seems reasonable,"[48] even though he had not recognized that such an option was a possibility at the time Chase proposed to increase his APR in July 2009.[49]

### B. Members of the Putative Class Would Have Held Diverse Expectations Based on Differing Past Experiences With Credit Cards

25.     Differing past experiences with credit cards also lead to diversity in expectations among members of the putative class. There is abundant support for the view that individualized

---

[44] Rockwell Deposition, 128:8 – 11.
[45] Rockwell Deposition, 144:24 – 146:17.
[46] The WaMu solicitation (Rockwell Deposition, 120:17 – 122:13), the WaMu CMA (Rockwell Deposition, 127:2–18, 130:3 – 131:2), Change in Terms (Rockwell Deposition, 144:24 – 146:17 (Mr. Rockwell found the description of the opt-out provision "confusing," but did allow that it was possible that someone else would understand it)), the Chase CMA (Rockwell Deposition, 146:22 – 150:10).
[47] Rockwell Deposition, 53:6 – 53:24.
[48] Rockwell Deposition, 113:15 – 114:1.
[49] Rockwell Deposition, 53:23 – 54:24.

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

experiences with financial products, including credit cards, shape expectations and behavior. A

2011 Federal Reserve Bulletin article states that "individual differences in experience, expertise,

and self-confidence affect how consumers process information."[50] This is particularly true when

it comes to processing disclosures:

> Because the knowledge and previous experience that people bring when
> reading a form can both help and hinder their understanding of what they
> read, contextual information can also aid consumers in interpreting the
> form content. A consumer with some knowledge of a specific product, or
> of the general workings of financial markets, may be better able to
> comprehend disclosures. However, prior knowledge that is incorrect or
> irrelevant may also lead participants to misunderstand or misinterpret
> information on a form.[51]

26.    An important component of past experience will be a given cardholder's past

experience with different credit cards, which may have had different CMAs specifying different

policies regarding penalty rates and repricing. Survey data finds that issuers differ on terms such

as grace periods, fee policies, penalty rate policies, and repricing policies.[52]

27.    Economic research shows that experience begets familiarity with terms of credit

cards and other financial products.[53] It is natural to conclude that cardholders who had been

repriced previously would be more familiar with the policy, although even among those

consumers there might be diverse expectations.

28.    Nor does repricing appear uncommon, meaning that prior experiences with

issuers other than Chase might affect expectations of Chase customers who were not yet repriced

by Chase. "Customer service representatives at 20 surveyed banks were asked: 'Do you raise my

---

[50] Hogarth, J., and E. A. Merry (2011), "Designing Disclosures to Inform Consumer Financial Decisionmaking: Lessons Learned from Consumer Testing," *Federal Reserve Bulletin*, 97:3, p. 3.

[51] Hogarth, J., and E. A. Merry (2011), "Designing Disclosures to Inform Consumer Financial Decisionmaking: Lessons Learned from Consumer Testing," *Federal Reserve Bulletin*, 97:3, p. 13.

[52] "2008 Credit Card Survey," *Consumer Action*, July 22, 2008, available at http://www.consumer-action.org/news/articles/2008_credit_card_survey (last accessed: June 26, 2012).

[53] Agarwal, S., J. Driscoll, X. Gabaix, and D. Laibson (2011), "Learning in the Credit Card Market," Working Paper, p. 1.

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

**LANE POWELL PC**
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

13

interest rate because of my credit record with other credit cards or lenders?' At the time of the survey it appeared that Chase, Citi, Commerce Bank, Discover, EverBank, Franklin Templeton Bank & Trust, GE Money Bank, HSBC, Metropolitan National Bank and US Bank would raise cardholder APRs based on information from credit reports and credit scores."[54]

29.    A survey of large issuers says this: "Of the top 10 U.S. credit card issuers, Consumer Action found that nine had change of terms clauses in solicitation materials that allowed changes to existing cardholders' account terms. Of the nine, only two (American Express and Wells Fargo) do not mention a right to change terms because of credit report information or the consumer's record with other creditors. Capital One says it may change APRs or fees, etc. for 'competitive or general economic reasons,' and reserves the right to check credit history to determine the level of increase, 'if any.'"[55]

30.    The foregoing types of varying experiences would apply to the putative class in this case. The putative class as defined by Plaintiffs is made up of Chase cardholders with varied histories. Cardholders could have had multiple cards from different issuers. There is also variation in the length of time they have been cardholders of any one particular card. For many cardholders, mergers and acquisitions can change or lead to a new governing CMA. For example, Chase has acquired credit card portfolios from Providian Financial, WaMu (where Mr. Rockwell first obtained his card), and from its merger with Bank One Corporation, and some of the acquired portfolios have been augmented by acquisitions of yet other portfolios.[56] Class members who came to Chase as customers of these heritage issuers may have had various CMAs

---

[54] "Universal Default: Gone or Just Hiding out?" *Consumer Action 2007 Credit Card Survey*, May 23, 2007, available at http://www.consumer action.org/news/articles/2007_credit_card_survey (last accessed: February 29, 2012).

[55] "Universal Default: Gone or Just Hiding out?" *Consumer Action 2007 Credit Card Survey*, May 23, 2007, available at http://www.consumer action.org/news/articles/2007_credit_card_survey (last accessed: February 29, 2012).

[56] J.P. Morgan Chase & Co. form 10-K for fiscal year 2001, p. 39; J.P. Morgan Chase & Co. form 10-K for fiscal year 2008, pp. 10, 16, 65; "Bank One Completes Wachovia Credit Card Portfolio Purchase," *J.P. Morgan Chase & Co. Press Release*, July 27, 2001.

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

**LANE POWELL** PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

1   over time (with various forms of disclosure) that will have been changed in various ways

2   (including changes in APR). Furthermore, they may have experienced repricing policies under

3   multiple different issuers.

4          31.    Moreover, putative class members' expectations would be anticipated to vary

5   depending on the specific type and amount of repricing at issue. Chase repricings could vary

6   significantly in both regards. For example, a standard (or "preferred") APR could change if it is a

7   variable rate APR and the Prime Rate changes. A standard APR could further change when any

8   applicable promotional period ended. If the cardmember defaulted per the terms in the CMA, the

9   preferred APR could change to a higher rate up to and including a default rate. A standard APR

10  could change via a proposed Change in Terms. Based on the numerous individualized factors

11  discussed above, putative class members would be anticipated to have had different and varying

12  expectations about whether Chase could re-price in these ways.

13         32.    Mr. Rockwell's testimony again exemplifies this type of varying individual

14  experience and its impact on expectations about the issues in the case. Mr. Rockwell was a

15  WaMu customer who was converted to being a Chase customer, and over the course of years he

16  received numerous disclosures from the banks—including letters, CMAs, and Changes-in-Terms

17  notices.[57] In addition, he held numerous credit cards from other banks at various times, and his

18  interactions with those institutions also acted to form his own individual expectations.[58] For

19  example, Mr. Rockwell testified that when he would receive mailings, such as the new Chase

20  cardmember agreement he received in January 2010, he was "not surprised," because he'd gotten

21  them before.[59]

---

[57] Rockwell Deposition, 39:19 – 22, 139:18 – 140:1.
[58] Rockwell Deposition, 77:2 – 7, 74:3 – 75:8
[59] Rockwell Deposition, 181:13 – 182:20.

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

**LANE POWELL PC**
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

15

33.     Other members of the putative class, who would have had different experiences with WaMu, Chase, and other financial institutions, would have formed different expectations from Mr. Rockwell. For example, a member of the putative class whose account had previously been repriced by WaMu, Chase, or some other bank, would be more likely subsequently to have an expectation that banks could reprice. And a customer who had previously opted out of a proposed change on an account at WaMu, Chase, or some other bank, would be more likely subsequently to have an expectation that it was possible to opt out. Similarly, differences in past experiences would generate diversity among members of the putative class concerning expectations about, for example, when a change could be proposed, the reasons a change could be proposed, and what balances a change might apply to.

**C.     Members of the Putative Class Would Have Held Diverse Expectations Based on Differences in Attending to Third Party Sources of Information about Credit Card Terms**

34.     Credit card holders are also diverse in how they acquire and attend to information from third party sources about credit card terms and other financial products, and this would be another source of diversity in actual expectations among members of the putative class.

35.     For many cardholders, the media and the internet are important sources of information.[60] For instance, consumer finance websites such as *creditcards.com* clarify the meanings of such terms as "APR" and "universal default," and make these terms more accessible to card members who are looking for this information.[61] Others consider friends and family to be the "most influential" source of information about credit cards.[62] Diversity in acquiring and

---

[60] *Recharging Credit Card Marketing to Meet Evolving Customer Expectations*, Epsilon, July 2010 p.5, describing "preferred channels for receiving information about credit cards," including email, postal mail, company website, product review website, Facebook, mobile phone and text messages.

[61] "Credit Card Terms and Glossary," *CreditCards.com*, March 11, 2009, available at http://www.creditcards.com/credit-card-news/credit-card-glossary-terms-first-credit-card.php (last accessed: June 27, 2012).

[62] *Marketing to Meet Evolving Customer Expectations*, Epsilon, May 2010, p.3.

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

16

attending to information from these types of third party sources will generate diversity in expectations about repricing.

36.     Discussions in the media of repricing, which in many cases include discussions about the right to opt out, were widely available during the putative class period in this case. For example:

- *The New York Times* reported in November 2008: "[Citigroup] Credit card holders will be notified that the bank is raising their rates when they receive their November statements; customers with online statements will receive a separate mailing. Citigroup cardholders will then have until the end of January to turn down the higher interest rates. If they decline the rate increase, they will pay down the balances on their accounts under the old pricing terms and will be able to continue to make charges until their credit cards expire."[63]

- The *Wall Street Journal* reported in December 2009: "When you open the envelopes, here are some details to look for and moves you may want to consider: Is the credit-card's interest rate or annual fee changing? Many companies have been aggressively raising rates as high as 29.99%. But you now have the right to 'opt out' of these changes before they become effective, essentially canceling the card for new purchases, though you can continue to pay off the balance at the old interest rate."[64]

- The *Wall Street Journal* reported in April 2009: "On Tuesday, Tamara Smith of Burlington, Vt., got a notice from Bank of America that her 7.9% rate will

---

[63] "Despite Pledge, Citigroup to Raise Credit Card Rates, Blaming 'Difficult' Environment," *New York Times*, November 14, 2008, available at http://www.nytimes.com/2008/11/15/business/15citi.html (last accessed: June 27, 2012).

[64] "Credit-Card Mail May Be Boring, But Ignoring It Could Cost You," *Wall Street Journal*, December 16, 2009, available at http://online.wsj.com/article/SB10001424052748703438404574597860806674746.html (last accessed: June 27, 2012).

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

17

increase to nearly 13%. She immediately called the bank and opted out of the change. That means she keeps the 7.9% rate on her roughly $2,000 balance, but can't use the card for new purchases without having the higher rate apply to her entire balance.... Ms. Frye, an adult home-care provider, said Bank of America notified her that it was going to raise her variable rate to 13.74% from 9.74%. She is in the process of transferring her $1,700 balance on the card to a credit card with Wells Fargo & Co. offering her a promotional rate of 0%."[65]

37.     The websites in this small sample of citations receive millions of visitors each month: the *Wall Street Journal* website gets more than 13 million unique visitors each month, and the *New York Times* website gets around 44 million unique visitors each month.[66]

38.     In addition to articles in the public press and media that explain how repricing works generally, and widely publicized stories of how some customers have responded to proposed rate changes, financial advice columns encourage cardholders to propose their own changes in terms—primarily by requesting a lower account APR. For example, one article by Bloomberg's *BusinessWeek.com* advises cardholders to "[j]ust call your credit-card company and ask them for a lower rate."[67] Similarly, a *U.S. News* column says "Often, the negotiation process is as simple as asking your creditor for a reduced rate."[68] *Fox Business* has an article entitled

---

[65] "BofA to Boost Rates on Cards With Balances," *Wall Street Journal*, April 9, 2009, available at http://online.wsj.com/article/SB123922365800702453.html (last accessed: June 27, 2012).

[66] "WSJ.com Audience Profile," *Wall Street Journal*, May 2012, available at http://www.wsjmediakit.com/downloads/WSJcom_Audience_Profile.pdf?120627032925 (last accessed: June 27, 2012). "The New York Times Media Kit Online," *The New York Times*, February 2012, available at http://nytmarketing.whsites.net/mediakit/online (last accessed: June 27, 2012).

[67] "Credit Card Survival Guide," *Bloomberg BusinessWeek*, September 4, 2007, available at http://www.businessweek.com/bwdaily/dnflash/content/sep2007/db2007091_214837.htm (last accessed: June 28, 2012).

[68] "How to Get Your Credit Card Rate Lowered in 5 Steps," *U.S. News Money*, February 8, 2012, available at http://money.usnews.com/money/blogs/my-money/2012/02/08/how-to-get-your-credit-card-rate-lowered-in-5-steps (last accessed: June 28, 2012).

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

18

"How to Ask for a Lower Credit Card Rate."[69] Another article on *creditcards.com* discussed whether balances have to be repaid immediately upon opting out, and provided the answer that they do not:

> [Question] I have just been notified by my bank that it is going to increase the interest rate on my credit card to 27 percent. I have been given a month to accept or decline the change. My question is that if I decline, am I expected to pay the full balance right away or will I be allowed to continue to make payments at the original interest rate until the card is reimbursed? ....[Answer] The simple answer is that if your credit card issuer allows you to opt out of an interest rate increase—and not all do—you will not be expected to pay immediately what you owe in full.[70]

39.     These websites are widely visited: *BusinessWeek.com* has more than 13 million unique visitors each month,[71] U.S. News has more than 13 million visitors each month,[72] and Fox Business has approximately 2.4 million visitors each month.[73] Many such websites include detailed scripts for conversations with credit card representatives, to assist card members as they propose to amend the terms of their agreement with the card issuer.[74] In some cases the script includes a threat to close or stop using the account if the APR is not reduced by the card issuer,

---

[69] "How to Ask for a Lower Credit Card Rate," *Fox Business*, March 21, 2011, available at http://www.foxbusiness.com/personal-finance/2011/03/16/script-ask-lower-credit-card-rate/ (last accessed: June 28, 2012).

[70] "How to opt out of credit card rate increases," *creditcards.com*, February 12, 2009, available at http://www.creditcards.com/credit-card-news/opt-out-credit-card-rate-increase-1292.php (last accessed: June 28, 2012).

[71] "Businessweek.com Audience," *Bloomberg*, October 2011, available at http://bloombergmedia.com/digital/businessweek-com/audience/ (last accessed: June 29, 2012).

[72] "U.S. News Media Kit Audience," *U.S. News*, January, 2012, available at http://mediakit.usnews.com/audience.php (last accessed: June 28, 2012).

[73] "Fox Business Audience Profile" *Fox Business*, March, 2011, available at http://advertise.foxbusiness.com/audience-profile/ (last accessed: June 28, 2012).

[74] See, for example: "How to Ask for a Lower Credit Card Rate," *Fox Business*, March 21, 2011, available at http://www.foxbusiness.com/personal-finance/2011/03/16/script-ask-lower-credit-card-rate (last accessed: June 16, 2012); "How to negotiate a lower credit card interest rate," *Squawkfox*, October 24, 2011, available at http://www.squawkfox.com/2011/10/24/negotiate-credit-cards/ (last accessed: June 16, 2012). Also, *eHow* and *U.S. News and World Report Money* advice cardholders to contact their banks: "What to Say to Lower Your Interest Rates," *eHow*, available at http://www.ehow.com/info_8032824_say-lower-interest-rates.html (last accessed: June 16, 2012); and "How to Get Your Credit Card Rate Lowered in 5 Steps," *U.S. News and World Report Money*, February 8, 2012, available at http://money.usnews.com/money/blogs/my-money/2012/02/08/how-to-get-your-credit-card-rate-lowered-in-5-steps (last accessed: June 16, 2012).

DECLARATION OF
VICTOR STANGO
CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

1    or suggests that the cardholder mention having received many competing offers from other

2    issuers recently.[75]

3        40.    A U.S. PIRG survey published in 2002 similarly emphasized the fact that

4    cardmembers may propose changes in terms to card issuers, particularly changes in APRs, and

5    quotes results of a survey in which 56% of cardmembers who proposed changes in terms were

6    able to successfully negotiate lower APRs.[76] A series of Consumer Action Surveys (2008–2009)

7    offer similar advice.[77]

8        41.    Mr. Rockwell's testimony is yet again illustrative of the important role of third

9    party sources in forming expectations, and is also emblematic of the diverse ways in which

10    expectations can evolve. Mr. Rockwell testified that although he had no expectations based on

11    the contents of Chase disclosures, in the fall of 2009—i.e., after his reprice had gone into

12    effect—he formed a view about his repricing and his CMA based on something he saw in the

13    press or on television.[78] Mr. Rockwell specifically testified that he was a reader of the *New York*

14    *Times*.[79] Although he recalled reading articles about repricing, including articles in some of the

15    sources quoted above—many of which explicitly mention the right to opt out and pay off

16    balances at existing terms—he believed that opting out meant that Chase might demand

17    immediate payment of his existing balances, and so believed that opting out was not an option

18

19    [75] "Want a lower credit card rate? Just ask," *Bankrate.com*, April 15, 2002, available at
20    http://www.bankrate.com/finance/credit-cards/want-a-lower-credit-card-rate-just-ask.aspx (last accessed: June 27, 2012).

21    [76] *Deflate Your Rate: How to Lower Your Credit Card APR*, Massachusetts Public Interest Research Group, March 2002, available at http://www.masspirg.org/sites/pirg/files/reports/MASSPIRGdeflateyourrate3_02.pdf. The
22    renegotiation process proposed in the PIRG survey was brief, and led to reductions that were in some cases larger than 1500 basis points.

23    [77] "Credit Card Rates Rising," *Consumer Action 2009 Credit Card Survey*, August 12, 2009 (http://www.consumer-action.org/news/articles/2009_credit_card_survey/); "2008 Credit Card Survey," Consumer Action, July 22, 2008, (http://www.consumer-action.org/news/articles/2008_credit_card_survey).

24    [78] In his deposition, Mr. Rockwell recalled hearing around the time that his card was repriced that Chase was "upping rates and kicking people off and demanding full payment when they close accounts." Rockwell
25    Deposition 47:4 – 8, 170:9 – 173:22.

[79] Rockwell Deposition 47:20 – 48:4.

26

27    DECLARATION OF
    VICTOR STANGO
28    CASE NO. 2:10-CV-01602

**LANE POWELL** PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
206.223.7000 fax: 206.223.7107

1  for him.[80] At his deposition was the "first time" he had recognized the possibility of opting out

2  and paying down his balances at the existing terms of his CMA.[81]

3      42.     Other putative class members who absorbed information from diverse media

4  sources such as the ones discussed above would have formed different expectations, at different

5  times, from Mr. Rockwell. This is another source of diversity in the expectations that one would

6  expect to find among putative class members.

7  **VI.    Conclusion: Determining Actual Cardholder Expectations Would Require an
        Individualized Inquiry**

8

9      43.     In my professional opinion, because—as discussed above—expectations about

10  repricing and the related issues in this case will have varied from cardholder to cardholder, and

11  because expectations will have been shaped by diverse factors that are highly individualized,

12  discerning the actual expectations held by a particular cardholder would require an individual-

13  level inquiry.

14      44.     To reiterate, the most direct evidence of diversity in cardholder expectations

15  comes from the qualitative research conducted by the Federal Reserve in its evaluation of

16  disclosures. Those qualitative studies involved small focus groups and ninety-minute "one-on-

17  one discussions with consumers."[82] The Federal Reserve's investment in this kind of

18  individualized inquiry and the diversity in expectations resulting from such inquiry are both

19  evidence of the importance of individual diversity in expectations regarding credit card terms,

20  including repricing and the right to opt out.

21      45.     In addition, the highly individualized nature of customers' approaches to

22  disclosures, prior experiences with credit cards and use of third-party sources for information

23

24  [80] Rockwell Deposition 49:14 – 51:12.
    [81] Rockwell Deposition 51:17 – 53:1.

25  [82] *Design and Testing of Effective Truth in Lending Disclosures*, Macro International, May 16, 2007, pp. 4, 8-9, 17-
        19.

26

27  DECLARATION OF                     **LANE POWELL PC**
    VICTOR STANGO                      1420 Fifth Avenue, Suite 4100
                                       Seattle, Washington  98101-2338
28  CASE NO. 2:10-CV-01602             206.223.7000 fax: 206.223.7107

1    about terms would apply to members of the putative class, and this further highlights the need for

2    individualized inquiry in determining expectations. Mr. Rockwell's testimony—concerning his

3    history of dealings with WaMu and Chase (and other banks), how little attention he paid to

4    Chase (and other card issuer) disclosures, and the role of other information sources like the

5    media and conversations with friends/acquaintances—further illustrates dimensions of diversity

6    that would be seen throughout the class and is emblematic of the need for individualized inquiry

7    to determine actual expectations.

8        46.     In contrast to Mr. Rockwell, other putative class members might have paid

9    different levels of attention to CMAs, Change-in-Terms notices, and other communications from

10   WaMu and Chase; would have had different past experiences with repricing; would have had

11   different past dealings with Chase and other banks; and might have acquired and used

12   information from third party sources differently. Differences in all of those factors would have

13   shaped different expectations within the putative class regarding repricing, the right to opt out,

14   and other aspects of credit card terms relevant to the issues in this case. I am aware of no

15   methodology that would enable one to determine the diverse actual expectations of members of

16   the putative class without conducting an individual inquiry.

17       I declare under penalty of perjury that the foregoing is true and correct.

18       EXECUTED in _Portland, Maine_ on this _30th_ day of

19   June, 2012.

20

21                                          VICTOR STANGO

22

23

24

25

26

27   DECLARATION OF
     VICTOR STANGO
28   CASE NO. 2:10-CV-01602

LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington  98101-2338
206.223.7000 fax: 206.223.7107