# Appendix A

Victor Stango
Graduate School of Management
University of California, Davis
Davis, California 95616
Email: vstango@ucdavis.edu
Phone: (530) 752-3535
Web: http://faculty.gsm.ucdavis.edu/~vstango/

---

**CURRENT POSITIONS**

UC Davis Graduate School of Management, Associate Professor, 2010-present
International Journal of Industrial Organization, Associate Editor, 2004-present

**EDUCATION**

UC Davis (1996), Ph.D. in Economics.
University of Pennsylvania (1991), B.A. in Economics and Political Science.

**FIELDS**

Household finance, banking, regulation and consumer protection, industrial organization.

**JOURNAL PUBLICATIONS**

1.  "Fuzzy Math, Disclosure Regulation and Credit Market Outcomes: Evidence from Truth in Lending Reform" (with Jon Zinman), *Review of Financial Studies* 24(2), 2011: 506-534.

2.  "Strategic Incompatibility in ATM Markets" (with Chris Knittel), *Journal of Banking and Finance* 35(10), October 2011: 2627- 2636.

3.  "Some New Evidence on Competition in Payday Lending Markets," *Contemporary Economic Policy*, March 2011: 149-161.

4.  "Exponential Growth Bias and Household Finance" (with Jon Zinman), *Journal of Finance* 64(6), December 2009: 2807-2849.

5.  "How Does Incompatibility Affect Prices? Evidence from ATMs" (with Chris Knittel), *Journal of Industrial Economics* LVII (3), September 2009: 557-582.

6.  "What Do Consumers Really Pay on Their Checking and Credit Card Accounts? Explicit, Implicit and Avoidable Costs" (with Jon Zinman), *American Economic Review Papers and Proceedings* 99 (2), May 2009: 424-429.

7.  "Incompatibility, Product Attributes and Consumer Welfare: Evidence from ATMs" (with Chris Knittel), *BE Journal of Economic Analysis and Policy* 8(1) (Advances), 2008.

8.  "The Causes of Bargaining Failure: Evidence from Major League Baseball" (with Amy Farmer and Paul Pecorino), *Journal of Law and Economics* XLVII(2), October 2004: 543-568.

9.  "Ask Prices, Offers and Time-to-Sale in an Online Exchange" (with Amy Farmer), *Economic Inquiry* 42(1), January 2004: 14-28.

10. "The Economics of Standards Wars," *Review of Network Economics* 3(1), March 2004:1-19.

11. "Price Ceilings, Focal Points, and Tacit Collusion: Evidence from Credit Cards" (with Chris Knittel), *American Economic Review* 93(5), December 2003: 1703-1729.

12. "Strategic Responses to Regulatory Threat in the Credit Card Market," *Journal of Law and Economics* XLVI (2), October 2003: 427-452.

13. "Pricing with Consumer Switching Costs: Evidence from the Credit Card Market," *Journal of Industrial Economics* 50(4), December 2002: 475-492.

14. "Competition and Pricing in the Credit Card Market," *Review of Economics and Statistics* 82(3), August 2000: 499-508.

15. "Environmental Regulation as an Entry Barrier for Small Manufacturing Establishments: A Longitudinal Examination," *Journal of Environmental Economics and Management* 40, 2000: 56-75. (with Tom Dean and Robert Brown).

16. "Ranking Graduate Programs by Graduate Publications," *Economic Inquiry* 38(2), April 2000, 358-367. (with Jeffery T. Collins and Richard G. Cox).

17. "The Tax Reform Act of 1986 and the Composition of Consumer Debt," *National Tax Journal* LII (4), December 1999, 717-739.

**WORKING PAPERS AND WORK IN PROGRESS**

18. "Celebrity Endorsements, Reputation Risk and Firm Value: Evidence from the Tiger Woods Scandal" (with Chris Knittel). Resubmitted (2nd round), *Management Science*.

19. "Limited and Varying Consumer Attention: Evidence from Shocks to the Salience of Overdraft Fees" (with Jon Zinman), NBER Working Paper 17028. In submission.

20. "The Productivity Benefits of IT Outsourcing" (with Chris Knittel).

**OTHER PUBLICATIONS**

21. "Debit or Credit: How People Choose to Pay" (with Jon Zinman), Research Monograph, Filene Institute, November 2008.

22. "The Economics and Strategy of Standards and Standardization" (with Shane Greenstein), in Scott Shane (ed.), *Handbook of Technology and Innovation Management*: Blackwell, Oxford, UK 2008.

23. "Outsource or Die," (with Jon Zinman), Research Monograph, Filene Institute, August 2007.

24. "Credit Cards," (with Julian Wright), *New Palgrave Dictionary of Economics*: MacMillan, Hampshire, UK, 2007.

25. *Standards and Public Policy* (ed., with Shane Greenstein), Cambridge Press, 2006.

26. "Outsourcing, Firm Size and Product Complexity," (with Yukako Ono), *Federal Reserve Bank of Chicago Economic Perspectives*, 1st Quarter 2005: 2-11.

27. "Emerging Payment Standards and Public Policy," (with Tom Ciesielski and Carrie Jankowski), Federal Reserve Bank of Chicago *Annual Report*, 2004.

28. "The Economics of Standards: Public Policy and Market Performance" (with Carrie Jankowski), Federal Reserve Bank of Chicago *Fed Letter*, August 2004.

## GRANTS AND AWARDS

Russell Sage Foundation Grant "Behavioral Biases in Household Financial Decision-making," 2011-2012.
Finalist, UCD GSM Professor of the Year, 2010.
National Science Foundation Grant "Information Technology, Outsourcing and Productivity," 2008-2010.
NET Institute Research Grant, Summer 2004, Summer 2006.
Filene Institute Research Grant "Outsource or Die," 2006-2007.
Filene Institute Research Grant "Payment Choices," 2006-2008.
FDIC Research Grant, 2006.
Allen H. Keally Teaching Award, University of Tennessee, 1999-2000.
Club 6 (High Teaching Evaluations), Haas School, UC Berkeley, 1998.
Finalist, Allen H. Keally Teaching Award, University of Tennessee, 1997-98.

## RECENT PROFESSIONAL PRESENTATIONS

"Limited and Varying Attention: Evidence from Shocks..."
American Economic Association Annual Meeting (2011), Kellogg (2010), Federal Reserve Bank of Chicago (2009)

"Homeownership, Consumption and the Housing Wealth Collapse of 2006-2008"
NBER Summer Institute CRIW group (2009)

"What Do Consumers Really Pay on Their Checking and Credit Card Accounts?
Explicit, Implicit and Avoidable Costs"
American Economic Association Annual Meeting (2009)

"Exponential Growth Bias and Household Finance"
Yale Behavioral Science Conference (2008), American Economic Association (2008), UC Davis (2008), Cornell University (2008), Federal Reserve Bank of Chicago (2008), Dartmouth College, Economics Department (2006).

"The Productivity Benefits of IT Outsourcing"
Northwestern (2010), UC, Berkeley (2008), American Economic Association (2008), Federal Reserve Bank of Kansas City (2008), NBER Summer Institute Productivity Group (2007).

"Fuzzy Math, Disclosure Regulation and Credit Market Outcomes"
Stanford University (2008), NBER Summer Institute Law and Economics Group (2008), American Economic Association (2007), UC Berkeley (2006), Georgetown University (2006), Federal Reserve Board (2006), IIOC Conference (2006), Federal Trade Commission (2005).

## PAST POSITIONS

UC Davis Graduate School of Management, Assistant Professor, 2008-2010

National Bureau of Economic Research, Research Economist, 2009-2011
Tuck School of Business, Associate Professor, 2004-2008
Federal Reserve Bank of New York, Visiting Senior Economist, 2004
Federal Reserve Bank of Chicago, Economist/Senior Economist, 2001-2003
University of Chicago GSB, Adjunct Assistant Professor, 2001-2003
UC Berkeley, Haas School of Business, Visiting Assistant Professor, 1998
University of Tennessee, Assistant Professor, 1996-2001

## COURSES TAUGHT

Microeconomics (undergrad, MBA), Industrial Organization (undergrad, Ph.D.), Competitive
Strategy (undergrad, MBA), Government and Business (undergrad, MBA), Public Economics
(undergrad).

# Appendix B

# List of Documents Relied Upon

## Public Press

- "BofA to Boost Rates on Cards With Balances," *Wall Street Journal*, April 9, 2009, available at http://online.wsj.com/article/SB123922365800702453.html (last accessed: June 27, 2012).
- "Businessweek.com Audience," *Bloomberg*, October 2011, available at http://bloombergmedia.com/digital/businessweek-com/audience/ (last accessed: June 29, 2012).
- "Credit-Card Mail May Be Boring, But Ignoring It Could Cost You," *Wall Street Journal*, December 16, 2009, available at http://online.wsj.com/article/SB10001424052748703438404574597860806674746.html (last accessed: June 27, 2012).
- "Credit Card Survival Guide," *Bloomberg BusinessWeek*, September 4, 2007, available at http://www.businessweek.com/bwdaily/dnflash/content/sep2007/db2007091_214837.htm (last accessed: June 28, 2012).
- "Despite Pledge, Citigroup to Raise Credit Card Rates, Blaming 'Difficult' Environment," *New York Times*, November 14, 2008, available at http://www.nytimes.com/2008/11/15/business/15citi.html (last accessed: June 27, 2012).
- "Fox Business Audience Profile," *Fox Business*, March 2011, available at http://advertise.foxbusiness.com/audience-profile/ (last accessed: June 28, 2012).
- "How to Ask for a Lower Credit Card Rate," *Fox Business*, March 21, 2011, available at http://www.foxbusiness.com/personal-finance/2011/03/16/script-ask-lower-credit-card-rate (last accessed: June 16, 2012).
- "How to Get Your Credit Card Rate Lowered in 5 Steps," *U.S. News and World Report Money*, February 8, 2012, available at http://money.usnews.com/money/blogs/my-money/2012/02/08/how-to-get-your-credit-card-rate-lowered-in-5-steps (last accessed: June 16, 2012).
- "The New York Times Media Kit Online," *The New York Times*, February 2012, available at http://nytmarketing.whsites.net/mediakit/online (last accessed: June 27, 2012).
- "U.S. News Media Kit Audience," *U.S. News and World Report*, January 2012, available at http://mediakit.usnews.com/audience.php (last accessed: June 16, 2012).
- "WSJ.com Audience Profile," *Wall Street Journal*, May 2012, available at http://www.wsjmediakit.com/downloads/WSJcom_Audience_Profile.pdf?120627032925 (last accessed: June 27, 2012).

i

## Websites

- "2008 Credit Card Survey," *Consumer Action,* July 22, 2008, available at http://www.consumer-action.org/news/articles/2008_credit_card_survey (last accessed: June 26, 2012).
- "CARD Act Factsheet," *Consumer Financial Protection Bureau*, February 22, 2010, available at http://www.consumerfinance.gov/credit-cards/credit-card-act/feb2011-factsheet/ (last accessed: June 26, 2012).
- "Credit Card Rates Rising," *Consumer Action 2009 Credit Card Survey*, August 12, 2009, available at http://www.consumer-action.org/news/articles/2009_credit_card_survey/ (last accessed: February 29, 2012).
- "Credit Card Terms and Glossary," *CreditCards.com*, March 11, 2009, available at http://www.creditcards.com/credit-card-news/credit-card-glossary-terms-first-credit-card.php (last accessed: June 27, 2012).
- "Credit cardholders have little awareness of changes in their cardholder agreements," *Institute of Consumer Financial Education*, November 14, 2003, available at http://www.financial-education-icfe.org/financial_news_press_releases/2003/20031114_credit_cardholders_have_little_awareness.asp (last accessed: June 26, 2012).
- "How to Negotiate a Lower Credit Card Interest Rate," *Squawkfox*, October 24, 2011, available at http://www.squawkfox.com/2011/10/24/negotiate-credit-cards/ (last accessed: June 16, 2012).
- "How to opt out of credit card rate increases," *CreditCards.com*, February 12, 2009, available at http://www.creditcards.com/credit-card-news/opt-out-credit-card-rate-increase-1292.php (last accessed: June 27, 2012).
- "Still Waiting: 'Unfair or Deceptive' Credit Card Practices Continue as Americans Wait for New Reforms to Take Effect," The Pew Health Group, October 2009, available at http://www.pewtrusts.org/uploadedFiles/wwwpewtrustsorg/Reports/Credit_Cards/Pew_Credit_Cards_Oct09_Final.pdf (last accessed: June 26, 2012).
- "Universal Default: Gone or Just Hiding out?" *Consumer Action 2007 Credit Card Survey,* May 23, 2007, available at http://www.consumer-action.org/news/articles/2007_credit_card_survey (last accessed: February 29, 2012).
- "Want a lower credit card rate? Just ask," *Bankrate.com*, April 15, 2002, available at http://www.bankrate.com/finance/credit-cards/want-a-lower-credit-card-rate-just-ask.aspx (last accessed: June 27, 2012).
- "What to Say to Lower Your Interest Rates," *eHow,* available at http://www.ehow.com/info_8032824_say-lower-interest-rates.html (last accessed: June 16, 2012).

000031

**Research Reports**

- *Deflate Your Rate:  How to Lower Your Credit Card APR*, Massachusetts Public Interest Research Group, March 2002.
- *Design and Testing of Effective Truth in Lending Disclosures*, Macro International Inc., May 16, 2007.
- *Design and Testing of Effective Truth in Lending Disclosures:  Findings from Qualitative Consumer Research*, Macro International Inc., December 15, 2008.
- *Marketing to Meet Evolving Customer Expectations*, Epsilon, May 2010.
- *Recharging Credit Card Marketing to Meet Evolving Customer Expectations*, Epsilon, July 2010.


**J.P. Morgan Chase Documents**

**SEC Filings**

- J.P. Morgan Chase & Co. form 10-K for fiscal year 2001.
- J.P. Morgan Chase & Co. form 10-K for fiscal year 2008.

**Press Releases**

- "Bank One Completes Wachovia Credit Card Portfolio Purchase," *J.P. Morgan Chase & Co. Press Release*, July 27, 2001.


**Academic  Literature**

- Agarwal, S., J. Driscoll, X. Gabaix, and D. Laibson (2011), "Learning in the Credit Card Market," Working Paper.
- Calem, P., and L. Mester (1995), "Consumer Behavior and the Stickiness of Credit-Card Interest Rates," *The American Economic Review*.
- Rachlinski, J. (2006), "Cognitive Errors, Individual Differences, and Paternalism," *University of Chicago Law Review*.


**Federal Reserve Publications**

- Benton, M., S. Meier, and C. Sprenger (2007), "Overborrowing and Undersaving: Lessons and Policy Implications from Research in Behavioral Economics," *Federal Reserve Bank of Boston Discussion Paper*, No. 2007-4.

000032

- Bricker, J., A. B. Kennickell, K. B. Moore, and J. Sabelhaus (2012), "Changes in U.S. Family Finances from 2007 to 2010: Evidence from the Survey of Consumer Finances," *Federal Reserve Bulletin*, 98:2.
- Durkin, T. A. (2000), "Credit Cards: Use and Consumer Attitudes, 1970–2000," *Federal Reserve Bulletin*, 86:9.
- Durkin, T. A. (2002), "Consumers and Credit Disclosures: Credit Cards and Credit Insurance," *Federal Reserve Bulletin*, 88:4.
- Durkin, T.A. (2006), "Credit Card Disclosures, Solicitations, and Privacy Notices: Survey Results of Consumer Knowledge and Behavior," *Federal Reserve Bulletin*, 92:8, A109–A121.
- Hilgert, M., J. Hogarth, and S. Beverly (2003), "Household Financial Management: The Connection between Knowledge and Behavior," *Federal Reserve Bulletin*, 89:7.
- Hogarth, J., and E. A. Merry (2011), "Designing Disclosures to Inform Consumer Financial Decisionmaking: Lessons Learned from Consumer Testing," *Federal Reserve Bulletin*, 97:3.
- Pappalardo, J. K., *Promise and Pitfalls of Consumer Mortgage Disclosures*, Federal Reserve Bank of New York,  January 6, 2010, available at http://www.newyorkfed.org/banking/Pappalardo_Promise_Pitfalls_%20of_Consumer_Mortgage_Disclosures.pdf (last accessed:  June 16, 2012).

**Deposition and Exhibits**

- Deposition of Brion Rockwell on June 18, 2012.
- WaMu Preapproval Solicitation (Dkt. # 14-1).
- WaMu Account Agreement (Dkt. # 14-3).
- January 2009 Chase Conversion Letter and Cardmember Agreement (Dkt. # 14-4).
- July 2009 Change in Terms Notice (Dkt. # 14-5).

# Appendix C

Rockwell v. Chase Bank                              Brion Rockwell

Page 38

1    and that's what that writing seemed like to me.

2        Q    When you say "that writing," what writing are

3    you referring to?

4        A    That -- I don't know the technical term.  I

5    guess the agreement that they sent.  The really dense

6    thing, like an accordion.

7        Q    Is there any particular part of the writing

8    that you are referring to?

9        A    Just the whole document just seemed designed

10   to -- to put you to sleep, is the only way I can

11   describe it.

12       Q    And which document are you referring to?

13       A    The Chase agreement.

14       Q    Which agreement?

15       A    There was an agreement that comes when you get

16   the credit card, and I think they brought one with a

17   change of terms.  And I tried to read it, but it was

18   too difficult to get through.

19       Q    Do you remember when you received the

20   agreement?

21       A    Not exact dates.  Washington Mutual, seems

22   like I got that in 2008.  And then Chase bought them,

23   or sucked them up, or whatever they did to them,

24   shortly after.  And so I can't remember the exact

25   dates, no.

Rockwell v. Chase Bank                                    Brion Rockwell

1    Q    Okay.

2         Is the agreement you are referring to one you

3    received from Washington Mutual?

4    A    No, I'm talking the agreement -- I probably

5    tried to read the Washington Mutual one.  I remember

6    it was like 9.9 percent.  That seemed like a pretty

7    good deal.  And then it was sold out and Chase sent

8    another one and, you know, I tried to read that, and

9    again it was difficult to read.  All you read is kind

10   of the front, where they are kind of -- they seemed to

11   give you a little bit of space where you can read it,

12   and then you get into it, and it becomes dense and

13   difficult to read.

14   Q    So you think you probably read the Washington

15   Mutual one, but you are not sure?

16   A    I'm not sure.

17   Q    Are you sure that you received the Chase one

18   that you just testified about?

19   A    I believe I did receive it.  I remember they

20   changed the credit card from Washington Mutual to

21   Chase at some point.  And it seemed like a --

22   something came and I tried to read it.

23   Q    When you say you tried to read it, what did

24   you do?

25   A    I sat down, opened it up and tried to go

Rockwell v. Chase Bank                                Brion Rockwell

 1    through it.  The print -- I don't normally need

 2    glasses to read, I need them to drive, but it was so

 3    small that I was thinking, well, maybe I should buy a

 4    magnifying glass.  I didn't have a magnifying glass.

 5    I tried to get through -- tried to get through it.  It

 6    was just like, it was too boring, it was too hard, too

 7    dense.  It was just -- I mean, maybe I could have got

 8    through it, but I would have not comprehended it.  It

 9    would have been like when you read something, and

10    you maybe see the words, and you can even -- you know,

11    if I had a magnifying glass and see what they are

12    saying.  But it's something that was designed to be

13    forgettable, to not be able to comprehend it.  That's

14    the way -- that's my opinion of it.

15        Q    Did you comprehend any of it?

16        A    I could comprehend possibly individual

17    sentences, but the whole -- the whole -- no, I

18    couldn't comprehend it.  By the time you got into it,

19    you forget what you [sic] said.  That type of writing,

20    you forget what they said two sentences before because

21    it was so -- designed that way.

22        Q    And you didn't read through the whole thing?

23        A    No, I didn't.

24        Q    Did you read past the first sentence?

25        A    I probably read the first paragraph, maybe two

Rockwell v. Chase Bank                                    Brion Rockwell

Page 41

1    paragraphs.

2        Q    But not beyond that?

3        A    No.

4        Q    And that's the agreement you are referring to

5    when you say the contract was too dense to read?

6        A    Yes.  The terms of agreement, I think that's

7    what they call it.

8        Q    You also said you thought -- I'm sorry, strike

9    that.

10            You also testified that you are pursuing a

11   claim that the agreement was unfair.

12       A    Right.

13       Q    What did you mean by that?

14       A    It just seems like, that they agreed when I --

15   I have a credit card.  I -- I think I put 4- or $5,000

16   on it at 9.9 percent, then Chase bought it and said,

17   No, sorry, it's actually -- what you just paid for

18   will be 16.9 percent.

19       Q    When did you --

20       A    It was like buying a car.  You agree to

21   5 percent interest rate at 5,000, you paid off it for

22   a month, and they -- it was like, you know, raised the

23   bar.  Or a house.  It seems like -- or a house, you

24   bought a house for, you know, 100,000 and -- at a

25   5 percent interest rate, and then in the middle of

Rockwell v. Chase Bank                          Brion Rockwell

Page 47

1    didn't know what to do at that point.  Sometimes you

2    go through life and you mull things over for a while,

3    so...

4        Q    I'm sorry, what is it that you read in the

5    newspaper that Chase was doing?

6        A    They were kicking people off.  Upping rates

7    and kicking people off and demanding full payment when

8    they closed their accounts.

9        Q    When who closed their accounts?

10       A    When Chase closed their credit card accounts.

11   It was widely, widely important in the news at that

12   point.

13       Q    What point was that?

14       A    During that era, about the time -- it seems

15   like during -- when Chase took over Washington Mutual.

16   You remember all the stuff that was happening.  But it

17   was widely reported that Chase was closing down

18   accounts, trying to -- basically demanding payment for

19   some accounts.

20       Q    Do you recall any specific newspaper you read

21   that in?

22       A    New York Times.

23       Q    Any others?

24       A    Maybe the Wall Street Journal.

25       Q    Any others?

Rockwell v. Chase Bank                                    Brion Rockwell

Page 48

1       A    Online.  I read a lot of stuff online.  The

2    Huffington Post possibly, The Nation possibly.

3       Q    Do you subscribe to the New York Times?

4       A    I used to, but I read it online now.

5       Q    What about the Wall Street Journal?

6       A    No, I read that occasionally.  In hotels they

7    have it.

8       Q    During that period, if you read about

9    something like this in the New York Times, would you

10   have read it in a hard copy delivered to your house or

11   online?

12      A    At that time I would have read it online.

13      Q    What about the Wall Street Journal?

14      A    I would maybe occasionally read the -- both of

15   them.  Besides online, I occasionally might read them

16   in a coffee shop and online.  I think Wall Street

17   Journal started charging, so I -- I can't remember

18   when I stopped reading that online.

19      Q    What about The Nation, did you subscribe to

20   The Nation?

21      A    No.

22      Q    So if you read about something like this in

23   The Nation, it would have been --

24      A    Online.

25      Q    -- online?

Rockwell v. Chase Bank                                    Brion Rockwell

Page 49

1      A    Yeah.

2      Q    Did you ever clip any newspaper articles or

3    Internet pages --

4      A    No.

5      Q    -- and save them?

6      A    No.

7      Q    Now, I asked you if you knew whether you had

8    an opportunity to opt out of the increase in your

9    APR --

10     A    Uh-huh.

11     Q    -- and you responded by mentioning these

12   newspaper articles.

13     A    Okay.

14     Q    Are you saying that because you had read

15   something in the newspaper, you understood that you

16   couldn't opt out?

17     A    I understood that if I opted out they possibly

18   would demand the 5,000 I owed them on the spot, and I

19   didn't have 5,000, so...

20          Again, this was all stuff that was gathering,

21   as information in my head, wondering what to do.  You

22   know, you don't -- sometimes things aren't black and

23   white, it takes a while.

24     Q    And when was this that you were --

25     A    This was -- I can't remember the exact dates.

Rockwell v. Chase Bank                                    Brion Rockwell

1    Q    Was this after you noticed the APR increase on

2    your credit card statement?

3    A    Some of the stuff was coming -- I can't

4    remember the exact dates, but because I -- whether

5    I -- I looked at it one day and that day I read an

6    article, I don't know.

7    Q    Am I correct that other than things you may

8    have read in newspapers, there was no other reason why

9    you might have thought you couldn't opt out of the APR

10   increase?

11   A    I'm not sure I understand the question.

12   Q    Let me ask it in a simpler way.  Was there any

13   other reason you thought you were unable to opt out of

14   the APR increase?

15   A    I don't know.

16   Q    So you can't identify any other reason?

17   A    No, I can't remember right now.

18   Q    Okay.

19        You didn't read anything about it in any other

20   source, other than newspapers online, Huffington Post,

21   The Nation?

22   A    All I remember is that time there was a lot of

23   stuff coming out about it.  And things I mentioned, it

24   could have been more; it could have been less.  But it

25   was information that was out there widely in this

Rockwell v. Chase Bank                                    Brion Rockwell

Page 51

1    country, widely reported in this country, and many

2    sources.  And unless you totally don't read, it would

3    have been impossible to not read something about it or

4    hear something on the television.

5        Q   Was it your understanding that you could opt

6    out of an APR change but that you might be required to

7    pay off your balance more quickly or immediately?

8        A   It was my understanding that they would --

9    they were actively calling in loans, and what that

10   meant to me was that -- that they would demand 5,000,

11   and I didn't have 5,000.  The possibility that they

12   would demand 5,000.

13       Q   When you say "calling in loans," what loans --

14       A   They were shutting credit cards down from

15   what -- what was being reported in the news, and

16   demanding full payment.

17       Q   If it had turned out that your understanding

18   was incorrect, that Chase was not going to require

19   immediate repayment of your loan, but would allow you

20   to repay your outstanding balance on the terms of your

21   existing cardmember agreement, would you have opted

22   out under those circumstances?

23       A   I'm not sure what the question is.  You're

24   saying if they didn't -- if they had kept the original

25   terms?

Rockwell v. Chase Bank                                    Brion Rockwell

Page 52

```
 1      Q    If you had been permitted to pay off your
 2  balance at the old interest rate, 9.99.
 3      A    If at that -- in full at that point?
 4      Q    Over time.
 5      A    Over time?
 6      Q    Under the terms of your existing cardmember
 7  agreement.
 8      A    If they wouldn't have -- you're asking me if
 9  they would not have raised it, my rates, would I have
10  filed a lawsuit?  No, I would not have.
11      Q    I wasn't asking whether you would have filed a
12  lawsuit, I was asking whether you would have opted out
13  of the APR increase.  In other words, closed your
14  account, in exchange for which you would have been
15  permitted to pay off your existing balance at the old
16  9.99 APR?
17      A    Oh, I don't know.  I didn't know that was -- I
18  don't know, because I didn't know that was an option.
19      Q    You thought it wasn't an option because of
20  what you had read in the newspaper; is that right?
21      A    Right.  You're asking me this question.  This
22  is the first time that I had never -- heard and even
23  thought about this, so I don't know.  My answer is I
24  don't know.  I mean it's a question that I have never
25  even considered.  You're the first person that -- so I
```

Rockwell v. Chase Bank                                    Brion Rockwell

Page 53

 1   don't know.

 2       Q    Would you have thought that such a proposal

 3   was unfair?

 4       A    I don't know.  I -- I'm not sure, again, what

 5   you are asking me.  Break it up again.

 6       Q    Suppose you had $100 balance on your credit

 7   card.

 8       A    Uh-huh.

 9       Q    And it's at a 9.99 APR under the terms of your

10   credit card agreement.  And the bank says to you, If

11   we are going to permit you to continue to use your

12   card, we are going to have to increase your APR on new

13   charges and your existing balance, but you have the

14   right to reject that change.  If you reject it, you

15   will be permitted to pay off your existing balance at

16   the 9.99 APR under all of the other applicable terms

17   of your existing cardmember agreement, but you won't

18   be able to use your card anymore, you are going to

19   have to close your account.

20       A    I don't know, I don't know right now.

21       Q    You don't know whether that's unfair or not?

22       A    No, it seems -- as you present it, it seems

23   possibly fair.  I didn't know that there was that

24   possibility.

25                MR. LESSER:  Why don't we take a --

Rockwell v. Chase Bank                                    Brion Rockwell

Page 54

1    we've been going for more than an hour.  Why don't we

2    take a break.

3                    MR. ODELL:  Okay.

4                    THE VIDEOGRAPHER:  Going off the record.

5    The time now is approximately 10:57 a.m.

6                        (A brief recess.)

7                    THE VIDEOGRAPHER:  Going back on the

8    record.  The time now is approximately 11:12 a.m.

9        Q    Mr. Rockwell, do you have a checking account?

10       A    Yes, I do.

11       Q    Which bank?

12       A    BECU.

13                    THE VIDEOGRAPHER:  Mr. Lesser...

14                    MR. LESSER:  Oh.

15       Q    Is that the only checking account you may have

16   currently?

17       A    I think I might have a second one, if it

18   hasn't been closed.  It's inactive.  They changed the

19   name of the bank, so I can't remember the name of that

20   bank.  It could be active or not, I don't know.

21       Q    Have you ever had a Chase --

22       A    Yes, I did.

23       Q    -- checking account?

24       A    Yes, I did.

25       Q    When was that?

Rockwell v. Chase Bank                                    Brion Rockwell

Page 74

```
 1   were required to keep lending you additional money?

 2        A    I'm not sure I understand the question.

 3        Q    Did you have an expectation that the credit

 4   card issuers leading up to your bankruptcy were

 5   obligated to allow you to charge more money to your

 6   card?

 7        A    I don't think so.  I think they were -- by the

 8   time I declared bankruptcy, I didn't do it -- it had

 9   been a couple years since probably most of these debts

10   had occurred, and I didn't know -- I didn't file the

11   second.  Probably a couple years had passed before

12   most of these debts -- two or three years, and I

13   didn't know what to do about it, so finally I thought

14   maybe bankruptcy was the best way to do it.

15        Q    Had the -- had the credit card issuers closed

16   the accounts --

17        A    Yes, they did.

18        Q    -- to any charges?

19        A    Yeah.

20        Q    When did they do that?

21        A    Probably in -- I -- I can't remember, but my

22   guess, best guess would be approximately around 2002,

23   possibly.

24        Q    And that seemed reasonable to you?

25        A    Did what seem reasonable?
```

Rockwell v. Chase Bank                                    Brion Rockwell

Page 75

1       Q    For a credit card bank to say to someone in

2   your situation, We're not going to lend you any more

3   money under these circumstances?

4       A    Um, yeah.

5       Q    Why does that seem fair?

6       A    Why does it seem fair?

7       Q    Yes.

8       A    Because I couldn't repay.

9       Q    Suppose one of those banks had said to you

10  under those circumstances, We would be willing to

11  allow you to charge additional charges to your

12  account, but based on your circumstances and the risk

13  associated with doing that, we can only do it by -- if

14  we raise your APR on both new and existing charges.

15  You don't have to do it, but that's the offer?

16      A    I don't know.  I don't really understand the

17  question.

18      Q    That's not something you have thought about?

19      A    No.  I mean, I don't know what you are -- if

20  you want to rephrase that.  I don't know what you are

21  asking, really.

22      Q    No --

23      A    Okay.

24      Q    -- I'll withdraw it.

25           MR. LESSER:  Let's do Tab 7.

Rockwell v. Chase Bank                                    Brion Rockwell

Page 77

 1    A    Yes.

 2    Q    When did you open the Capital One card?

 3    A    Approximately, I don't know, maybe two years

 4  ago.  Two or three years ago.

 5         I had a secured -- after my bankruptcy, I had

 6  a secured credit card through Evergreen, and then got

 7  the unsecured Washington Mutual.  And at some point, I

 8  wanted to close that secured -- unsecured one because

 9  I understood that you can build your credit back up

10  better if you had a couple of secured -- or unsecured

11  credit cards.

12    Q    So the Cap One card is unsecured?

13    A    Right.

14    Q    Is that why you opened that Cap One account?

15    A    To try to -- yeah, to try to -- I was told

16  that if you had two credit cards, you could build your

17  credit back up.

18    Q    Who told you that?

19    A    I don't know.  I don't know.  I was -- I can't

20  remember.

21    Q    Financial advisor?

22    A    I can't remember, but I was told by somebody

23  who said, Oh, open up another one.  Maybe -- I can't

24  remember.  Probably a financial person, I don't know.

25    Q    Where would the financial person have been?

Rockwell v. Chase Bank                                    Brion Rockwell

Page 88

1    that up.  If -- if you weren't making your payments or

2    if they pull a credit report, I guess they can.  Okay.

3         Q    Have you ever -- aside from the Chase account

4    that we've been taking about for the most part today,

5    have you ever had a credit card bank increase your

6    APR?

7         A    I -- I can't remember.

8         Q    It might have happened but you can't recall?

9         A    I can't recall.

10        Q    And say in 2007, did you have any expectation

11   about whether that could happen?

12        A    2007?

13        Q    Yes.

14        A    When I had the secured credit card?

15        Q    Well, you had had all these prior credit cards

16   before your bankruptcy, then you had the secured card.

17   Did you have any -- I understand you can't recall

18   whether it had ever happened to you, but in 2007, did

19   you have any expectation one way or the other about

20   whether a credit card bank could increase your APR?

21        A    In 2007, I think -- I don't think I had even

22   thought about credit cards.  I had recently gone

23   through bankruptcy.  I think that was when I first got

24   my secured one, so that's the only thing I thought of.

25   I didn't think I had access to credit cards at that

Rockwell v. Chase Bank                                    Brion Rockwell

Page 89

1    point, besides the secured ones.  So I don't think I

2    would have thought too much about credit cards in

3    general in 2007, except for the one that I had.

4        Q    What about in 2008?

5        A    The question again, what would I have thought,

6    what have I generally thought about credit card rates?

7    I -- I can't say that I could -- that I would know

8    about that.  I mean it's a question that I don't

9    understand.  If I would have generally, walking down

10   the street, thought about credit card rates, if that's

11   the question, no.

12       Q    We are almost out of time on this tape --

13       A    Okay.

14       Q    -- so we will have to stop, but just to return

15   to a couple of things.

16            You described reading in newspapers some

17   information you understood about Chase --

18       A    Right.

19       Q    -- and what might happen if an account were

20   closed.  Do you recall whether the situations

21   described there were situations where the bank closed

22   an account?

23       A    Yes, the -- yes.  Again, this isn't just one

24   little article, it was all over the news in several

25   sources.  I mean, you couldn't get away from it if you

Rockwell v. Chase Bank                                        Brion Rockwell

Page 91

1              MR. LESSER:  Why don't we take a break.

2              THE WITNESS:  All right.

3              THE VIDEOGRAPHER:  Going off the record.

4    The time now is approximately 12:07 p.m.  This is the

5    end of Disk No. 1 in the deposition of Brion Rockwell.

6                   (Lunch recess.)

7              THE VIDEOGRAPHER:  Going back on the

8    record.  The time now is approximately 12:53 p.m.

9    This is the beginning of Disk No. 2 in the deposition

10   of Brion Rockwell.

11      Q   Mr. Rockwell, would you agree that when you

12   use a credit card, the bank that issued the card

13   extends you credit?

14      A   Yes.

15      Q   And would you agree that you entered into a

16   series of contracts when the bank approved your

17   purchases or cash advance?

18      A   Yes.

19      Q   And that was true of your WaMu card before it

20   was converted to a Chase card?

21      A   Yes.

22      Q   And true of the card after Chase acquired it

23   and it was converted?

24      A   The card after Chase that was converted?

25      Q   After Chase acquired your WaMu account and

Rockwell v. Chase Bank                                    Brion Rockwell

Page 92

1    converted it to a Chase --

2        A    Right.

3        Q    -- account?

4        A    Yes.

5        Q    Still true?

6        A    Uh-huh.

7        Q    What are the terms of the contract you enter

8    into with the bank when it approves a purchase?

9        A    What are the exact terms?  They agree to pay

10   it back.

11       Q    Any other terms?

12       A    I'm not sure what the question is.

13       Q    Well, it's an open-ended question.  Are there

14   any other terms that come to mind --

15       A    No.  That you -- I think extend you credit and

16   you pay it back.  It's usually at a monthly payment.

17       Q    And what determines the terms under which you

18   have to repay the money you borrow?

19       A    The bank.  It's not usually something you

20   negotiate with them, that I've seen.

21       Q    Is it written down somewhere?

22       A    Yeah, they send you this little dense packet.

23   And so they seem to have this form they send you, that

24   seems un -- that's pretty much unreadable, but you

25   want the credit, so I guess you sign it.

Rockwell v. Chase Bank                           Brion Rockwell

Page 93

1          That's my answer.

2     Q    That's the cardmember agreement you are

3  referring to?

4     A    I think so.  I can't remember all the titles,

5  any titles.

6     Q    Okay.

7          And when you opened your WaMu account, you had

8  a cardmember agreement?

9     A    Yes, I believe so.

10    Q    And that cardmember agreement set forth the

11  terms that governed the contract that was formed when

12  you used your card?

13    A    Yeah, there seemed to be like two phases:  One

14  that's pretty big, and you can actually read it, and

15  there's -- on the back, and then there's a more dense

16  one that, if I recall, is like several pages of tiny

17  writing.  One's normal writing, like might be out of a

18  newspaper; one is writing about that small.

19    Q    And when Chase acquired your account and

20  converted it to a Chase account, you received a new

21  cardmember agreement --

22    A    Yes, I think I did.

23    Q    -- from Chase?

24    A    Yeah.

25    Q    And those were the terms that governed your

Rockwell v. Chase Bank                                    Brion Rockwell

Page 94

```
 1    card from that date on, from the effective date of --

 2        A    I would --

 3        Q    -- that cardmember agreement?

 4        A    I would agree with that, probably.

 5        Q    Now, did you form any expectations about the

 6    terms of the contract you formed when you used your

 7    card based on the cardmember agreement?

 8        A    I don't recall having any expectations, except

 9    that I believe I remembered it being a zero

10    introduction, then up to 99 point -- 9.9 percent.

11        Q    Do you recall whether you read the WaMu

12    agreement when you opened the account?

13        A    Again, I remember reading -- I seem to

14    remember there was a two-part.  One was a larger one,

15    and I would -- probably got through that, but I don't

16    think I remember getting through the other one.  You

17    start reading -- I probably started it, but it was --

18    I mean the only word I can use is sleepy; it makes you

19    sleepy to try to read that.

20        Q    And when Chase sent you a new cardmember

21    agreement --

22        A    Uh-huh.

23        Q    -- is that the one you testified about

24    earlier, that you may have read the first paragraph or

25    so but couldn't get through more than that?
```

Rockwell v. Chase Bank                                    Brion Rockwell

```
                                                        Page 95
 1      A   I can't remember what I testified, but I
 2   probably -- most documents I'll take a look at, try to
 3   read in general, if I'm opening anything.  But if
 4   it -- when it's that dense, it's just too difficult to
 5   read.  I mean, it's just -- again, I think I might
 6   have -- I recall -- you can read individual sentences,
 7   but you start reading on, then it seems to be designed
 8   so I can't remember the thing, the paragraph before.
 9   And writing like that is really difficult to read.
10      Q   Given that, is it fair to say you didn't rely
11   on anything in that agreement in using your card?
12      A   I don't recall.  I don't recall relying on
13   that.
14      Q   You don't know one way or the other?
15      A   Yeah, I don't recall relying on that.
16      Q   You don't claim that you did, in any event?
17      A   I'm not sure what your question is.
18      Q   You're not claiming that you did rely on it,
19   you just don't remember one way or the other?
20      A   Right.
21      Q   Do you have any business relationships with
22   Mr. Odell?
23      A   No.
24      Q   With Mr. Harrod?
25      A   No.
```

Rockwell v. Chase Bank                                    Brion Rockwell

1    Q    My question is:  Would you agree that someone

2    else might think that was fair?

3    A    I can't speak -- speak for -- for the whole

4    world, but I think a lot of people would think it's

5    unfair.  I think a lot of people think it's unfair,

6    yeah.

7    Q    What is it that --

8    A    Unfair that you have an amount and an agreed

9    upon interest rate, and after you've spent that, they

10   jack up their rate for the stuff that you had already

11   agreed on an interest rate.

12   Q    To be clear, I'm talking about a circumstance

13   where the bank allows you to refuse the increase.

14   A    I don't understand the question.

15   Q    What we talked about earlier was a

16   circumstance where the bank says to the cardholder, If

17   you would like to continue using your card, as a

18   condition of doing that, new charges and your existing

19   balance will be subject to a higher APR, but you don't

20   have to accept that change.  If you don't want to

21   accept that change, you merely have to close your

22   account and stop using the card.

23   A    Without having to pay it off in full?

24   Q    Pay off the existing balance under the old

25   terms.

Rockwell v. Chase Bank                                    Brion Rockwell

Page 114

1     A    That seems reasonable.

2     Q    And would you agree that other people might

3  think that was reasonable as well?

4     A    I don't know.

5     Q    Do you claim in this case that Chase violated

6  any law?

7     A    No, I think they wrote the law.

8     Q    Regardless of who wrote the law, do you --

9     A    No, I don't believe they did.  I think they

10  wrote the law, but I don't think they violated it.  I

11  might add, there's this new law they are trying to

12  pass.  They are re -- they are writing that too, even

13  though it was passed by Congress.  Writing that as we

14  speak.

15    Q    Are you able to identify any statute that you

16  believe Chase violated?

17    A    No.

18    Q    When you originally opened your credit card

19  account with WaMu --

20    A    Uh-huh, yes.

21    Q    -- did you receive a solicitation?

22    A    Yes, I did.

23    Q    Did you receive it in the mail?

24    A    Yes, I did.

25    Q    You opened it?

Rockwell v. Chase Bank                                    Brion Rockwell

Page 117

1    it's very clear and with words you can read.  You go

2    to the second page, or the back, and you -- you would

3    need a magnifying glass to read this.

4        Q   Well, I understand the way --

5        A   I'm just pointing it out.  You showed it to

6    me.  I'm showing what it is for the court.

7        Q   The text is a little blurry.  I think that's

8    because of the way it was copied.

9        A   It's a different size, too.  See?  It's

10   probably like five times smaller.

11       Q   You don't dispute that this is the

12   solicitation you responded to?

13       A   I can't remember one way or the other.  You

14   know, this looks possible.

15       Q   Okay.

16       A   When was that?  It was several years ago.

17       Q   Did you read the solicitation?

18       A   This?

19       Q   The entire thing, the two pages.

20       A   Again, the back -- I mean, it was several

21   years ago, I can't recall.  I mean this is what --

22   this is what they want you to read, right here, and

23   back here it gets a lot more dense.  So whether I read

24   it, I can't remember.

25       Q   Just so I can get a clear answer, you don't

Rockwell v. Chase Bank                                    Brion Rockwell

Page 118

1   recall whether you read it?

2       A    This particular -- as this is set up, I don't

3   recall this particular document, but it is very

4   possible that this is the exact sample that they sent

5   me.  Sometimes I can't recall a novel that I read, you

6   know, two years ago.

7       Q    I'm really just trying to get a simple answer

8   to a simple question.

9            Do you recall whether you read it or not?

10      A    This?

11      Q    Yes, this document, Exhibit 6.

12      A    It's possible.  I answered that like four

13  times.  It's possible I read this.

14      Q    But you don't know?

15      A    I don't know.  To say did I read this -- was

16  this ex -- in my memory, that I read this exactly the

17  way this was done?  I -- I can't recall that, no.

18      Q    All right.

19           Do you see on the second page under the header

20  Terms and Conditions, it says, Annual percentage rate,

21  APR for purchases, zero percent through your statement

22  date in April 2009, introductory period, after that

23  9.99 percent?  In the first box.

24      A    Oh, yes, I see that.

25      Q    And then under that there's a box, Other APRs,

Rockwell v. Chase Bank                                    Brion Rockwell

Page 120

1    A    My testimony is that is very small.

2    Q    That's not my question.  I'm asking you

3    whether you are able to read it or not.

4    A    There's some words I can read and some of

5    it -- it might be because it's a combination of

6    blurry, that there's some words that I can read and

7    some that I can't.

8    Q    Are you testifying that I read it incorrectly?

9    A    No, I don't know.  No, I'm not.  I'm saying

10   it's a lot smaller than this, which I can read easily.

11   Q    Do you have an under -- I've read that to you.

12   I will represent to you that I read it correctly.

13   A    Okay.

14   Q    Do you have an understanding of what that

15   means?

16   A    Could you read it again, please?

17   Q    We may change the APR, fees and other terms of

18   your account at any time to the extent permitted by

19   applicable law and the account agreement, which we

20   will send you when your account is opened.

21   A    I do now, after going through this, what that

22   means.

23   Q    What do you think that means?

24   A    I guess it means the law that the banks wrote,

25   saying they can jack up the interest rates at any

Rockwell v. Chase Bank                                    Brion Rockwell

Page 121

1   point.  Which is now supposed to be -- a law that's

2   supposed to be remedied, which they are trying to get

3   right now, too.

4       Q    Okay.

5            And then it goes on.  It says, Factors we may

6   consider in determining whether and how to change your

7   terms include the frequency and severity of defaults

8   and other indications of overall credit risk.

9            Do you have an understanding of what that

10  means?

11      A    I understand if -- for -- what I seem to

12  understand what you are saying is that you can make

13  your payments on time and have decent credit, but if

14  someone else has bad credit, they are going to raise

15  your interest rates.

16      Q    And that's one of the terms of the agreement?

17      A    That appears to be, if what you are reading is

18  right.  If you're reading it correctly, that's what it

19  seems to be saying, yeah.

20      Q    And below that there's some language about the

21  default APR.  Each time you default on this, or any

22  Washington Mutual credit card account, because you

23  failed to make at least the minimum payment when due,

24  exceed your credit line, or make a payment --

25      A    Can't read it?

Rockwell v. Chase Bank                                    Brion Rockwell

Page 122

1      Q    -- to us that is not honored by your bank, we

2    may increase the APR on your account up to a maximum

3    of the default APR.

4      A    I heard what you said, but I don't understand

5    what they are saying.  If you explain it.

6      Q    Well, I think you testified earlier that you

7    understood that the bank could increase the APR in the

8    event of a default.

9      A    Oh, okay.  The way you explained it concisely,

10   yeah, I can understand that.

11     Q    And that was part of the agreement as well?

12     A    Right.  But you -- you explained it in a more

13   concise way than the agreement did.

14                    (Exhibit No. 7 marked.)

15     Q    Now, Exhibit 7, which is placed in front of

16   you, has a header Pre-Approval Request Form.  You will

17   see that some information is blacked out on this

18   version.  It's because it was filed in court.

19          Does that appear to be your signature?

20     A    Yes, it is.

21     Q    And do you recall signing this document?

22     A    I mean I don't exactly recall the second I

23   signed it.  I recall signing -- responding to that

24   offer, yes.

25     Q    Okay.

Rockwell v. Chase Bank                                    Brion Rockwell

Page 124

1     A    (Complies.)

2                (Exhibit No. 9 marked.)

3     Q    This is Exhibit 9.  It's the Washington Mutual

4     account agreement that is referenced in the

5     solicitation that we looked at --

6     A    Yes.

7     Q    -- a moment ago.

8          Do you recall reading this?

9     A    Not all the way through.  I don't recall

10    reading this.

11    Q    Is this the document that you thought you

12    might have read a paragraph or two of?

13    A    Yeah.

14    Q    And other than this agreement, did you read

15    any other account agreements from Chase at any time?

16    A    I can't recall.

17    Q    Okay.

18         I understand that you didn't read it -- well,

19    I won't characterize your testimony, but based on

20    whatever review of the document you did at the time,

21    did you have any understanding of any of the terms in

22    it?

23    A    No.

24    Q    Okay.  Put it aside.

25    A    (Complies.)

Rockwell v. Chase Bank                                    Brion Rockwell

1   I'm sorry.

2          Would you agree that someone else reading this

3   provision would have been better able to interpret it

4   than you?

5      A    I think I'm above average in intelligence.  I

6   would guess -- if you're asking me to guess, I would

7   guess that most people would not read this through and

8   get to Page 6 and find that.

9      Q    Okay.

10     A    Maybe some would.  I would say -- I would

11  guess the majority of customers would not read that

12  through and get to that.

13     Q    Would not read it and get to it?

14     A    Get to it.  Yeah, get to it.  And whether you

15  understand it, I don't know.

16     Q    Would you agree that some people would get to

17  it and some wouldn't?

18     A    Anything is possible.

19     Q    You don't know one way or the other?

20     A    I don't know.  I would guess -- I would guess

21  that most people -- this thing coming, and these

22  things, it's not even on one page.  These little

23  categories they have, that most -- I would guess that

24  most people would not read this.

25     Q    Isn't it true that someone's understanding of

Rockwell v. Chase Bank                                    Brion Rockwell

1   the terms of this agreement would depend on whether

2   they read it or not?

3       A   I think it's designed not to read it, and it's

4   hard to understand, and it's dense, and it puts you to

5   sleep.  Someone who has written in the past, this

6   writing, it seems designed to put someone to sleep.  I

7   mean, it's as simple as that.

8       Q   Isn't it true that someone's understanding of

9   the terms of this agreement would depend how much of

10  it that they read?

11      A   Possibly.  But again, you would have to go

12  back over it several times and highlight stuff.  And,

13  you know, it's like -- it's not designed to be easily

14  understood.

15      Q   Isn't --

16      A   I took Composition 101, and this is not --

17  this is not -- would be considered acceptable writing.

18      Q   Isn't it true that someone's understanding of

19  the terms of this agreement would depend on their

20  ability to comprehend the language that's in the

21  agreement?

22      A   Taken as a whole, try to read the whole thing,

23  I would think very few people could read this thing

24  without spending a lot of time going back over it,

25  reading it several times, making notes, to really

Rockwell v. Chase Bank                                        Brion Rockwell

Page 130

1    at before?  It's the third full page.

2        A    Okay.

3        Q    Panel 6.  And it's under -- it's under Account

4    Changes.  It says, If a change is made that increases

5    the APR or APRs that apply to your account, you will

6    be given an opportunity to avoid the change by closing

7    your account and paying off any existing balance under

8    the terms in effect prior to the change.

9            Do you see that?

10       A    I heard you read it, yes.  Oh, it's the one

11   with the large block writing here?  In here?

12       Q    It's below that, right above No. 10.

13       A    Okay.

14       Q    Isn't it true that that language is saying

15   that if the bank proposes to increase the cardholder's

16   APR, the cardholder will be given an opportunity to

17   avoid that increase by closing the account and will be

18   permitted to pay off the existing balance under the

19   terms in effect prior to the change?

20       A    The question is pay it off in one lump sum or

21   pay it off in payments?  I can't tell from what you

22   said.

23       Q    Well, it says, Under -- Under the terms in

24   effect prior to the change.

25       A    Right.

Rockwell v. Chase Bank                                    Brion Rockwell

Page 131

1      Q    You just don't know what those terms are?

2      A    Right.

3      Q    And you didn't read this at the time?

4      A    No.

5                MR. LESSER:  How long have we been

6      going?

7                THE VIDEOGRAPHER:  An hour and four

8      minutes.

9                MR. LESSER:  Do you want to take a

10     break?  We've been going for a while.

11               THE WITNESS:  I don't care.

12               MR. ODELL:  Sure, we can take a break.

13               MR. LESSER:  Okay.  Let's take a little

14     break.

15               THE VIDEOGRAPHER:  Going off the record.

16     The time now is approximately 1:57 p.m.

17                    (A brief recess.)

18               THE VIDEOGRAPHER:  Going back on the

19     record.  The time now is approximately 2:24 p.m.

20                    (Exhibit No. 10 marked.)

21     Q    You have in front of you Exhibit 10.

22     A    Uh-huh.

23     Q    It's some WaMu account statements from 2008 --

24     A    Uh-huh.

25     Q    -- from your account; is that right?

Rockwell v. Chase Bank                                      Brion Rockwell

Page 138

1     claim and what you expected Chase could and

2     couldn't -- could and could not do with respect to

3     APRs.  Does -- does the amount of a proposed APR

4     increase with a right to opt out affect your view on

5     whether the proposed increase is fair?

6         A    I think the big question is, is proposed -- I

7     think my -- your question is can they raise their

8     rates?  I mean my question -- I think it's fair to

9     propose a rate change ahead of time on stuff you

10    haven't purchased, but to me it seems unfair to raise

11    it on something that you have already purchased at a

12    certain rate.  Just my opinion.

13        Q    If the cardholder doesn't have a right to

14    reject the change?

15        A    I'm sorry?  I'm getting a little tired, so I

16    guess I --

17        Q    Understood.  Strike that.  Strike that

18    question.

19        A    Okay, okay.

20        Q    Does it matter whether the proposed rate

21    increase is very large or very small?  Suppose the

22    proposed rate increase is .5 percent.

23        A    You're asking my opinion, if it's fair for

24    them to raise .5 percent on purchases that you have

25    already made?  I --

Rockwell v. Chase Bank                                    Brion Rockwell

Page 139

1       Q    In 2009.

2       A    If that's the --

3       Q    I'm actually asking you about your --

4       A    Maybe that's the question.  My opinion, it's

5   not fair, but that's just -- you know, it's my

6   opinion.

7       Q    Okay.

8            And was that your -- would that have been your

9   expectation in 2009?

10      A    At 2009 I had -- I don't know what

11  expectations I had.

12      Q    Okay.

13      A    I mean, I wasn't -- I don't think I had -- I

14  thought about that much, in all honesty, until -- you

15  know, until it happened.

16      Q    Okay.

17                   (Exhibit No. 11 marked.)

18      Q    I have placed in front of you a document

19  marked Exhibit 11.  It's a letter from Chase.  I

20  understand it doesn't have your name on it, but I will

21  represent to you that it was -- it's the form of a

22  letter that was sent to you in January 2009.

23      A    Uh-huh.

24      Q    Do you recall receiving it?

25      A    Again, it's a long time ago.  I recall

Rockwell v. Chase Bank                                    Brion Rockwell

Page 140

1    something from Chase, yes.

2        Q    Did you read it?

3        A    I can't recall.

4        Q    Okay.  Is --

5        A    Let me read it right now and just see if it...

6        Q    Sure.

7        A    (Reviews document.)

8             I cannot recall this exact letter, but this is

9    something that I possibly would have -- would have

10   read all the way through.

11       Q    Okay.

12       A    It refers to the whole agreement.  If that was

13   that same thing, I probably wouldn't have read it.

14       Q    If it refers to the whole agreement, you

15   probably would not have read the cardmember agreement?

16       A    Yes.

17       Q    It also refers to a notice of change in terms.

18   Would you have read that?

19       A    If it was presented like this, as a letter

20   like this.  If it was that dense little package, no, I

21   would not have read it.

22       Q    Okay.

23            Now, you'll see in the bold language on the

24   page, it says, A Notice of Change in Terms, which

25   explains the changes to the cardmember agreement and

Rockwell v. Chase Bank                          Brion Rockwell

Page 143

1    document that was enclosed with -- with the letter

2    that we just looked at --

3        A    Okay.

4        Q    -- as Exhibit 11.

5            Do you see there's a section -- first of all,

6    seeing it doesn't refresh your recollection about

7    whether you read it or not?

8        A    Okay.

9        Q    You still believe you would not have read this

10   document?

11       A    Right.  I can't remember this particular

12   document, no.

13       Q    Okay.

14           Do you see under Summary of New Terms,

15   Section 1?

16       A    Oh, okay.  I see Summary of New Terms, yes.

17       Q    It says, Changes you can choose not to accept.

18       A    Your account will be governed by Delaware.

19       Q    Do you see that?

20       A    Uh-huh.

21       Q    So the account is now governed by Delaware

22   law, to the extent that federal law does not control.

23       A    Right.

24       Q    Do you see that?

25           You wouldn't have known what Delaware law was

Rockwell v. Chase Bank                                    Brion Rockwell

Page 144

1   at the time?

2       A    At the time, no, but I do now.

3       Q    What is Delaware law now?

4       A    Well, I just -- I'm aware that a lot of these

5   credit card companies are in Delaware, or that's where

6   it [inaudible].  You said this -- mine was actually

7   Nevada, but -- that they basically went in there and

8   wrote the laws.

9       Q    Do you know anything specific about what the

10  laws say?

11      A    No, I'm just -- what I read is just they went

12  in and -- into Delaware and South Dakota, the articles

13  I read, that kind of had a -- with the local

14  politicians and rammed it through before anybody was

15  even aware what was going on.  And -- but the Supreme

16  Court has ruled that -- what Delaware law is.  I'm

17  not -- and I'm citing -- that has been challenged in

18  Supreme Court and it has been found to be legal.

19      Q    Okay.

20      A    It was underhanded, the way it was done, from

21  what I read.  But basically the banks went in and

22  wrote their law and the politicians went along with

23  it.

24      Q    Do you see at the bottom there's a section

25  called Right to Opt Out?  And it says, You can opt

Rockwell v. Chase Bank                                    Brion Rockwell

Page 145

1     out, in parentheses, not accept, closed parentheses,

2     the changes described under Section 1 in the summary.

3            Do you see that?

4     A    Is that toward the top of it or toward the

5     bottom of that paragraph?

6     Q    It's at the bottom of the page.

7     A    (Reviews document.)

8     Q    Do you see that?

9     A    Yeah, I'm trying to read it.

10           (Reviews document.)

11           Okay.  I'm trying to wade through it, but

12    again, it's -- it gets confusing to me.

13    Q    In any event, you didn't read it at the time?

14    A    I don't think so.

15    Q    If you had read it and understood that you had

16    a right to opt out, would you have done something

17    differently?

18    A    I don't know, I'm reading it right now, and

19    even the way this is written, I don't know if I would

20    understand it.  It seems to start out being kind of

21    understandable.  By the last sentences they started

22    to -- it starts getting confusing, the way it was

23    written.

24           You were previously notified of any of the

25    changes described in the notice, and they were already

Rockwell v. Chase Bank                                    Brion Rockwell

1   in effect on the account, those terms will not become

2   applied.  Any [inaudible] APR remains subject to the

3   terms of the blah, blah, blah.

4           It just doesn't seem very concise writing.

5       Q    Is it possible that somebody else reading it

6   would understand it?

7       A    Possibly.

8       Q    Is it possible that someone else reading this

9   might opt -- have opted to close their account?

10      A    I don't know.

11      Q    You don't know one way or the other?

12      A    Yeah.

13          Your account will be closed, then in

14  parentheses, if not already closed.  I mean that

15  just -- just dead-ends the sentence.  Just like what

16  are they saying?  Then you may not use it for -- I

17  just...

18                   (Exhibit 13 marked.)

19      Q    All right.  You have in front of you

20  Exhibit 12.

21               MR. ROISMAN:  13.

22      Q    13, sorry.  Exhibit 13.  It's a cardmember

23  agreement.  I will represent to you that this is the

24  form of cardmember agreement that was enclosed with

25  the letter that's marked as Exhibit 11.

Rockwell v. Chase Bank                                    Brion Rockwell

Page 147

1      A    Uh-huh, yes.

2      Q    This is the -- the document you testified a

3   moment ago you would not have read; is that right?

4      A    Right, yes.

5      Q    So you don't recall --

6      A    I don't recall --

7      Q    -- reading this document?

8      A    -- this document, no.

9      Q    Can I ask you to turn to Page 6?

10     A    Six in their agreement or 6 in the --

11     Q    Six in the agreement.

12     A    Okay.

13     Q    And there's a section called

14  Default/Collection.  Do you see that?

15     A    Yes.

16     Q    It says, We may consider you to be in default

17  if any of these occur.  And then there are a number of

18  bullets.

19     A    Uh-huh.

20     Q    And those bullets include:  We do not receive

21  at least the minimum amount due by the date and time

22  due as shown in your billing statement; you exceed

23  your credit line; you fail to comply with the terms of

24  this agreement or any agreement with one of our

25  related companies; you obtain information that causes

Rockwell v. Chase Bank                                    Brion Rockwell

Page 148

1    us to believe you may be unwilling or unable to pay

2    your debts to us or to others on time; you file for

3    bankruptcy, or you become incapacitated, or in the

4    event of your death.

5            Do you see that?

6    A    Yes.

7    Q    And if you turn to Page 9, again, the

8    pagination in the agreement.

9    A    Uh-huh.

10    Q    There's a paragraph with the bold header,

11    Changes to This Agreement.

12    A    Yes.

13    Q    You didn't read this at the time?

14    A    No.

15    Q    It says, We can change this agreement at any

16    time regardless of whether you have access to your

17    account by adding, deleting or modifying any

18    provision.  Our right to add, delete or modify

19    provisions includes financial terms such as the APRs

20    and fees, and other terms such as the nature, extent

21    and enforcement of the rights and obligations you or

22    we may have relating to this agreement.

23    Modifications, additions or deletions are called

24    changes or a change.

25            Do you see that?

Rockwell v. Chase Bank                                        Brion Rockwell

Page 149

1      A    Yes.

2      Q    And then it says, We will notify you of any

3  change if required by applicable law.  These changes

4  may become -- may be effective with notice only at the

5  time stated in our notice in accordance with

6  applicable law.  Unless we state otherwise, any change

7  will apply to the unpaid balances on your account and

8  to new transactions.

9           Do you see that?

10     A    Yeah.  It's a perfect example of what I'm

11  saying.  It's just like, oh, you're reading and I'm

12  falling asleep.

13     Q    And then it goes on to say, The notice will

14  describe any rights you may have with respect to any

15  change and the consequences if you do or do not

16  exercise those rights.  For example, the notice may

17  state that you may notify us in writing by a specified

18  date if you do not want to accept certain changes we

19  are making.  If you notify us in writing that you do

20  not accept the changes, your account may be closed, if

21  it is not already closed, and you will be obligated to

22  pay your outstanding balance under the applicable

23  terms of the agreement.

24           Do you see that?

25     A    Yes.

Rockwell v. Chase Bank                                    Brion Rockwell

Page 150

1      Q    Now, that's saying for certain types of

2    changes, the cardholder will be provided an

3    opportunity to opt out, right?

4      A    If you say so.  Again, I'm not trying to make

5    a joke about this, but it's just your mind wanders.

6    You read it, when I am hearing you read it, it's hard

7    to focus on what you are saying.

8      Q    Is it fair to say somebody else reading this

9    paragraph might be able to understand it?

10     A    Perhaps.

11     Q    Okay.

12          If you had read this at the time, would you

13   have done anything different?

14     A    I don't know.

15     Q    Okay.  Put it aside.

16     A    (Complies.)

17                    (Exhibit 14 marked.)

18     Q    You have in front of you a document marked as

19   Exhibit 14.

20     A    Okay.

21     Q    I realize it doesn't have your name on it, but

22   I will represent to you that this is a form of a

23   document that was sent to you in or around July 2009.

24     A    Okay.

25     Q    Do you see at the bottom, in the first page,

Rockwell v. Chase Bank                                    Brion Rockwell

```
                                                        Page 151
 1    with the pagination of the document itself, there's a

 2    date, 07/09.  Do you see that?

 3        A    On the right?

 4        Q    Yeah.

 5        A    Okay.  So lower right I see that there's a

 6    date there.

 7        Q    Okay.

 8             Is this -- is this the type of -- well, let me

 9    ask you:  Do you recall receiving this document?

10        A    No.

11        Q    Is this the type of document that you would

12    have read had you received it?

13        A    No.  But, you know, I -- it's the type of

14    document -- this looks familiar to the type of

15    document that you get, yes.

16        Q    Okay.  You can put it aside for now.

17        A    Okay.

18                        (Exhibit No. 15 marked.)

19        Q    So this is Exhibit 15.  It's an account

20    statement.  Do you see your name on it?

21        A    Yes.

22        Q    And it's got a payment due date of

23    February 18th, '09.

24        A    Okay.

25        Q    Do you see that?
```

Rockwell v. Chase Bank                                    Brion Rockwell

Page 170

1       Q    It might be easier if you clear some of these

2    away.

3       A    I've got 24, 25, 26.  Oh, there's 27.

4       Q    That's a -- Exhibit 27 has -- is a statement

5    with a payment due date of January 16, 2010.

6       A    Right.

7       Q    Do you see that?

8       A    Right.

9       Q    And on all of these statements the APR on

10   purchases is 16.24 percent.  To be clear, when I say

11   "all of these," on Exhibits 25, 26 and 27 --

12      A    Correct.

13      Q    -- the APR on purchases is 16.24 percent.

14      A    Yes.

15      Q    And do I understand your testimony to be that

16   you don't know which one of these statements is the

17   one that caused you to notice the APR?

18      A    Yeah, I just remembered it was one of these.

19   Sometime around the holidays is when I first noticed

20   it.

21      Q    It would have been one of these three.

22           When you noticed the APR was 16.24 percent on

23   purchases, did you call the bank?

24      A    I don't recall that, no.

25      Q    Did you go to a branch?

Rockwell v. Chase Bank                              Brion Rockwell

Page 171

1    A    I can't remember.

2    Q    Did you --

3    A    I remember -- actually, I started doing kind

4    of -- this is when -- this is when -- it seemed like I

5    recall when this was happening and when this stuff

6    started becoming in the news.  And from there I

7    started reading about it.  The first time I was aware

8    of it, I can't remember ever going to a branch or

9    calling them about it.

10    Q    This is -- so this is the time period when you

11    read about the --

12    A    I became aware of it, yes.  I mean it was

13    probably out there, but I think I seen some -- it

14    might have been a PBS show with Elizabeth Warren, or

15    something like that.  I can't remember.  Or on MSNBC.

16    Somehow I saw Elizabeth Warren, or I started reading

17    articles about it.

18    Q    I don't think you mentioned that before.

19    Previously you mentioned --

20    A    I said everything.  It was all over the

21    television and I said newspapers.  I didn't say who.

22    Q    Just let me finish my question, because I want

23    the testimony to be as clear as possible.

24    A    Okay.

25    Q    Earlier, you testified about reading in the

Rockwell v. Chase Bank                                    Brion Rockwell

Page 172

1   New York Times, the Wall Street Journal, maybe the

2   Huffington Post, maybe The Nation, about bank

3   practices, including Chase, at some point in time.

4        A   I believe -- I believe --

5        Q   I'm sorry, let me finish the question.

6        A   Sorry.

7        Q   Are you testifying now that this is around the

8   time when you were reading those materials, meaning

9   in -- somewhere between November 2009 and January

10  2010?

11       A   Yeah, I testified I -- you know, I'm on the

12  computer, on the Internet.  And whether it was that

13  stuff that was being written that day, I can't

14  remember, but it was stuff on the Internet.  You know,

15  at some point I saw Elizabeth Warren being

16  interviewed.  I can't remember the exact dates.

17       Q   But it was around this time frame, meaning the

18  time frame of these account statements that we are

19  looking at?

20       A   I believe it was, yes.  But I can't -- what

21  I'm saying is I can't remember if it was me doing the

22  research, looking at -- Googling it, or if I -- if it

23  was coming up live.  But it seemed like there was a

24  lot on it, once I turned my attention to it.

25       Q   Other than a TV show with Elizabeth Warren, do

Rockwell v. Chase Bank                                    Brion Rockwell

Page 173

1    you remember anything else you saw on TV?

2        A    I don't remember any specific thing, but I

3    just remember it coming out of the TV.  I can't

4    remember what dates or anything like that.

5            It seemed like it was a pretty big discussion.

6    You know, with newspapers, I can't remember the exact

7    dates, but I just -- I can't remember exact dates on a

8    lot of things, but there was a lot of discussion

9    around this period of that law that they were trying

10   to pass, which they did kind of pass, about what was

11   happening and what the banks were trying to do.

12       Q    I'm not trying to --

13       A    I know.

14       Q    -- force you to recall specific dates.  I

15   understand that you can't do that.  I just want to be

16   clear that it's around this -- this time period of

17   these statements, Exhibits 25, 26 and 27?

18       A    And maybe -- yeah, I mean it might have

19   started earlier.  There's just been a lot of

20   discussion of it over the last few years, and I can't

21   remember exactly.  But when I noticed this over the

22   holidays, I know I became more aware of it.

23       Q    When you noticed that your APR had increased

24   to 16.24 percent --

25       A    Yes.

Rockwell v. Chase Bank                                    Brion Rockwell

Page 181

1    A    Okay.  Yes, I see that.

2    Q    Did you consider whether to use any of that

3    money to pay off your -- part of your credit card

4    balance?

5    A    No, because that would have probably went for

6    rent.

7    Q    Do you recall receiving a new cardmember

8    agreement in January 2010?

9    A    I can't recall any specific time that anything

10   came in the mail.

11              MR. LESSER:  Let's do that one, Tab 14.

12                  (Exhibit No. 31 marked.)

13   Q    You have in front of you a document marked as

14   Exhibit No. 31.  It's a cardmember agreement.  I will

15   represent to you that it was sent to you in or around

16   January 2010.

17              Seeing it, does it refresh your recollection

18   as to whether you received it?

19   A    No, it looks -- you know, it looks like all

20   the other ones.  You know, they all kind of blur

21   together.

22   Q    By January 2010, if you -- if you did receive

23   this, would you have been surprised to be receiving a

24   new cardmember agreement from Chase?

25   A    I can't remember what my reaction was.

Rockwell v. Chase Bank                                    Brion Rockwell

Page 182

1      Q    Well, it was at least the third time you had

2    received new terms on this account alone; is that

3    right?

4      A    Yeah, by then I just -- nothing they did

5    surprised me.

6      Q    So the more often a bank has changed the terms

7    on your account, the less likely you would be

8    surprised by that happening?

9      A    I don't know.

10     Q    Is that fair?

11     A    I don't understand how it -- the question, is

12   it fair?

13     Q    I'm just saying is that a fair

14   characterization?

15     A    No, it just seems like you get a lot -- a lot

16   of these in the mail, and they are all written like

17   this, so I'm not surprised when they come, no.

18     Q    Is part of the reason you're not surprised

19   because you had gotten them before?

20     A    Yeah, and they all look exactly the same.

21     Q    While he's putting those together, Exhibit 31,

22   the January 2010 cardmember agreement, this is not

23   something you would have read?

24     A    No.

25     Q    You don't dispute, do you, that the terms in

Rockwell v. Chase Bank                                    Brion Rockwell

1             F U R T H E R   E X A M I N A T I O N

2    BY MR. LESSER:

3        Q    Exhibit 14, you testified you didn't read this

4    at the time.

5        A    Right.

6        Q    And in the sentence you just read in response

7    to Mr. Odell's question, it says, To the extent

8    allowed by law.  It says, In addition, to the extent

9    allowed by law, we may require you to pay the

10   outstanding balance immediately or at any time after

11   your account is closed, right?

12       A    Right.

13       Q    Isn't it true, you don't know what the law

14   allows?

15       A    No, I don't know what the law allows.

16       Q    You don't know if the applicable law would

17   allow Chase to require immediate repayment of an

18   outstanding balance?

19       A    Well, I assume if they are making a point of

20   that, that the law that they probably have written

21   does allow that at that point.  I'm making an

22   assumption.

23       Q    You don't know?

24       A    No, I don't know, but I'm assuming that they

25   have written that law to do that.  That's all I'm

THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRION ROCKWELL,                            )
                                           )
                         Plaintiff,        )    No. 2:10-cv-01602 RSL
                                           )
        v.                                 )    **CERTIFICATE OF SERVICE**
                                           )
CHASE BANK,                                )
                                           )
                         Defendant.        )
_____)

        I hereby certify that on July 2, 2012 I caused to be served a copy of the following

documents on the person(s) named below in the manner and addressed indicated:

        1.  Chase Bank USA, N.A.'s Opposition to Plaintiff's Motion for Class Certification
        2.  Declaration of Victor Stango in Support of Defendant's Opposition to Motion
        3.  Declaration of Noah Levine in Support of Defendant's Opposition to Motion
        4.  Declaration of Dominic Giannangeli in Support of Defendant's Opposition to Motion
        5.  Declaration of Suzanne Morgan in Support of Defendant's Opposition to Motion
        6.  Certificate of Service

| Russell M. Odell | ☑ | by **CM/ECF** |
|---|---|---|
| Attorneys at Law | ☐ | by **Electronic Mail** |
| 251 153rd Place SE | ☐ | by **Facsimile Transmission** |
| Bellevue, WA  98007 | ☐ | by **First Class Mail** |
| RussellOdell@msn.com | ☐ | by **Hand Delivery** |
| | ☐ | by **Overnight Delivery** |
| R. Bruce Harrod | ☑ | by **CM/ECF** |
| 22522-A 88th Avenue W. | ☐ | by **Electronic Mail** |
| Edmonds, WA  98026 | ☐ | by **Facsimile Transmission** |
| brucedarleneharrod@hotmail.com | ☐ | by **First Class Mail** |
| | ☐ | by **Hand Delivery** |
| | ☐ | by **Overnight Delivery** |

CERTIFICATE OF SERVICE
No. 2:10-cv-01602

000088

1    DATED this 2nd of July, 2012 at Seattle, Washington.

2

3                              s/ Lynn Sandahl
                              Lynn Sandahl
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    CERTIFICATE OF SERVICE - 3
      CASE NO. 2-10-cv-01602

      **LANE POWELL** PC
      1420 FIFTH AVENUE, SUITE 4100
      SEATTLE, WASHINGTON 98101-2338
      206.223.7000 FAX: 206.223.7107

      119439.0006/5429705.6

000089